Appeal No. 2014-1165

# 𝔘nited 𝔖tates 𝔆ourt of 𝔄ppeals

*for the*

# 𝔉ederal 𝔆ircuit

---

BELIMO AUTOMATIC A.G.,

*Plaintiff-Appellant,*

– v. –

UNITED STATES,

*Defendant-Appellee.*

---

APPEAL FROM THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BRIEF FOR PLAINTIFF-APPELLANT

ROBERT B. SILVERMAN, ESQ.
PETER W. KLESTADT, ESQ.
ROBERT F. SEELY, ESQ.
GRUNFELD, DESIDERIO, LEBOWITZ,
  SILVERMAN & KLESTADT LLP
399 Park Avenue, 25th Floor
New York, New York 10022
(212) 557-4000

*Attorneys for Plaintiff-Appellant*

March 4, 2014

Form 9

FORM 9.  Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Belimo Automation A.G. _____ v. United States _____

No. 2014-1165

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Belimo Automation A.G. _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

Belimo Automation A.G.

---

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Not applicable

---

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

not applicable

---

4. ☐  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, 399 Park Avenue, New York, NY 10022: Robert B. Silverman, partner and Robert F. Seely, of counsel

---

3/03/2014 _____                          _____
       Date                                                            Signature of counsel

                                                                    Robert F. Seely
                                                                    _____
                                                                    Printed name of counsel

Please Note: All questions must be answered

cc: _____

# TABLE OF CONTENTS

**STATEMENT OF RELATED CASES**..................................................................1

**STATEMENT OF JURISDICTION**..................................................................1

**STATEMENT OF THE ISSUES**..................................................................1

**STATEMENT OF THE CASE SETTING OUT THE FACTS RELEVANT
TO THE ISSUES** ..........................................................................................2

   **A.   INTRODUCTION** .................................................................................2

   **B.  NATURE AND FUNCTION OF A COMMERCIAL HVAC SYSTEM** .4

   **C.   DESCRIPTION OF THE SUBJECT MERCHANDISE** ........................7

   **D.   FUNCTION OF THE SUBJECT MERCHANDISE** ...............................8

   **E.  THE CIT DECISION ON APPEAL** ..........................................................12

**SUMMARY OF ARGUMENT** ........................................................................16

**ARGUMENT** .........................................................................................................17

   **A.   STATEMENT OF THE STANDARD OF REVIEW** ............................17

   **B.  HEADING 9032, AS DEFINED BY NOTE 7 AND EXPLAINED BY
EN 9032, DESCRIBES THE SUBJECT MERCHANDISE** ...........................18

       1.   Note 7(a) Supports Classification as an Automatic Controller................19

       2.   EN 9032(I) Supports Classification of the Subject Merchandise as an
Automatic Controller of Heading 9032 ..........................................................20

       3.   The Subject Merchandise is an Automatic Flow Controller in Safety
Applications which is Identified as an Exemplar in EN 9032(I) .....................22

       4.   The Subject Merchandise is an Automatic Draft Regulator which is
Identified as an Exemplar in EN 9032(I) .........................................................24

   **C.   The Legislative History of Note 7 Clarifies that Heading 9032 Covers
Instruments or Apparatus that Directly or Indirectly Control the Variables
Flow and Temperature** ........................................................................................27

**D.     Note 7 Conforms to Scientific Principles of Automatic Control...........31**

   1.     The Trial Court Incorrectly Interprets Heading 9032 ..............................36

   2.     External Measurement of Flow is Not a Statutory Requirement.............40

   3.     The Court Erred in Describing the ASIC as a "Sophisticated Switch" ...43

**E.   THE CIT ERRED IN CLASSIFYING THE SUBJECT MERCHANDISE UNDER HTSUS HEADING 8501 AS AN ELECTRIC MOTOR.........................................................................................46**

   1.     HTSUS Section XVI Note 1(m) Excludes the Subject Merchandise from Heading 8501 because it is Classifiable under Heading 9032.........................46

   2.     The Court Misapplied the Federal Circuit Decision in *Nidec Corp. v. United States* in Holding that the Subject Merchandise was Classifiable under HTSUS Heading 8501 ...................................................................................49

**CONCLUSION...................................................................................53**

**ADDENDUM**

**PROOF OF SERVICE**

**CERTIFICATE OF COMPLIANCE**

# TABLE OF AUTHORITIES

## Cases

*Bausch & Lomb v. United States*, 148 F.3d 1363, 1366 (Fed. Cir. 1998) ...............18

*Belimo Automation A.G. v. United States*, Slip Op. 13-144 (Nov. 26, 2013), 2013 Ct. Int'l. Trade LEXIS 154 (2013) ..................................................... 2-3

*Carl Zeiss, Inc. v. United States*, 195 F. 3d 1375, 1378 (Fed. Cir. 1999) ...............18

*Kanematsu USA Inc. v. United States*, 185 F. Supp. 2d 1364, 1374 (CIT 2002) ....19

*Kirkendall v. Department of Army*, 479 F.3d 830, 857 (Fed. Cir. 2007) ................38

*Len-Ron Mfg. Co. v. United States*, 334 F. 3d 1304, 1309 (Fed. Cir. 2003) ...........15

*Lynteq, Inc. v. United States*, 976 F. 2d 693, 699 (Fed. Cir. 1992) .........................15

*Metchem, Inc. v. United States*, 513 F.3d 1342, 1345 (Fed. Cir. 2008) ..................18

*Mita Copystar Am., Inc. v. United States*, 21 F. 3d 1079, 1082 (Fed Cir. 1994) ....15

*Nat'l. Advanced Sys. v. United States*, 26 F. 3d 1107, 111 (Fed. Cir. 1994)...........50

*Nidec Corp. v. United States*, 68 F. 3d 1333, 1336-37 (Fed. Cir. 1995) .................49

*Nidec Corp. v. United States*, 861 F. Supp. 136 (CIT 1994) ...................................50

*Outer Circle Products v. United States*, 590 F. 3d 1323, 1326 (Fed. Cir. 2010) ....18

*Processed Plastics Co. v. United States*, 473 F. 3d 1164, 1168 (Fed. Cir. 2006) ...18

*Rollerblade, Inc. v. United States*, 112 F. 3d 481, 486 (Fed. Cir. 1997) .................15

*Warner-Lambert Company v. Apotex Corp. et. al.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003) ..........................................................................................................38

## Statutes

28 U.S.C. § 1295(a)(5)(2013) ....................................................................................1

## Other Authorities

*American Heritage Science Dictionary* ...................................................................36

*Dictionary.com* ........................................................................................................36

HSC Doc. 28.800 (Summary Record of the 28th Session of the Harmonized System Committee and of its Working Party" August 2, 1982), Annex IV/1 at para. 46 .................................................................................................................27

HSC Document 39.157 E (HSC Review Sub-Committee, 11th Session, Brussels, 16 December 1994 ..............................................................30

*McGraw-Hill Dictionary of Engineering (2nd edition)* ..................................... 32, 45

*McGraw-Hill Encyclopedia of Science & Technology* ...........................................32

Merriam-Webster On-Line Dictionary ....................................................................37

*Van Nostrand's Scientific Encyclopedia* vol. 1 at 753-756 (1989) ................. 33, 34

**Rules**

Federal Circuit Rule 47.5 ..........................................................................................1

## STATEMENT OF RELATED CASES

In accordance with Federal Circuit Rule 47.5, counsel for Plaintiff-Appellant, Belimo Automation A.G. ("Belimo") states that (a) no other appeal in or from the same civil action in the U.S. Court of International Trade ("CIT") was previously before this or any other appellate court, and (b) no other case is pending in this court that will directly affect or be directly affected by this Court's decision in this pending appeal.

## STATEMENT OF JURISDICTION

Belimo appeals from a final judgment and order of the USCIT. Pursuant to Rule 4(a)(1)(B) of the Federal Rules of Appellate Procedure, Belimo timely filed a notice of appeal to this Court. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. §1295(a)(5)(2013).

## STATEMENT OF THE ISSUES

Whether the CIT committed reversible error in excluding from heading 9032, Harmonized Tariff Schedule of the United States ("HTSUS") instruments or apparatus that automatically control flow by indirect measurement of its actual value?

Belimo says yes because heading 9032, as defined by Note 7 and EN 9032, and as described in the legislative history and the underlying authoritative sources, clearly covers automatic controllers that work directly or indirectly to control the flow of liquids or gases.

## STATEMENT OF THE CASE SETTING OUT THE FACTS RELEVANT TO THE ISSUES

### A.    INTRODUCTION

The subject merchandise consists of instruments or apparatus principally used in commercial heating, ventilating, and air conditioning ("HVAC") systems.  JA 95, 344.  These systems automatically control the flow of heated or chilled water and air in the pipes and the ducts in the system to control the temperature in buildings.  The subject merchandise is used to automatically control the flow of water and air within the system to achieve this objective.

The parties submitted this case to the CIT on cross-motions for summary judgment.  Recognizing that there were no material facts at issue, the CIT decided the case based on the cross-motions. The court granted defendant's cross-motion, affirming the Customs classification of the subject merchandise as electric motors in HTSUS heading 8501, and denied plaintiff's motion requesting classification as automatic controllers under heading 9032.  *Belimo*

*Automation A.G. v. United States*, Slip Op. 13-144 (Nov. 26, 2013), 2013 Ct.

Int'l. Trade LEXIS 154 (2013).[1]

The following HTSUS provisions are at issue:

| Heading/subheading | Description |
|---|---|
| **8501** | Electric motors and generators (excluding generating sets: |
| | Motors of an output exceeding 37.5 W: |
| 8501.10 | Of under 18.65 W: |
| | **** |
| 8501.10.40 | Other: |

**HTSUS Section XVI Note 1(m)** provides:

1. This section [including chapter 85] does not cover: …

   (m) Articles of Chapter 90…

| **Heading/subheading** | **Description** |
|---|---|
| **9032** | Automatic regulating or controlling instruments and apparatus; parts and accessories thereof: |
| | **** |
| | Other instruments and apparatus |
| | **** |
| 9032.89 | Other: |

---

[1] The text of Slip Opinion 13-144 (Nov. 16, 2013) was labeled "confidential" but subsequently released as the public version of the decision. The court attached at the end of its November 16 version a copy of the eight pages of the dictionary definitions cited in the Opinion. JA 6-29. *See* Addendum to this Brief. Those pages were not added to the public version dated December 12, 2013. The LEXIS print of the Opinion is JA 30-37.

****

9032.89.60                                        Other:

**HTSUS Chapter 90 Note 7** provides:

7.      Heading 9032 applies only to:

(a)  Instruments and apparatus for automatically controlling the flow, level, pressure or other variables of liquids or gases, or for automatically controlling temperature, whether or not their operation depends on an electrical phenomenon which varies according to the factor to be automatically controlled, which are designed to bring this factor to, and maintain it at, a desired value, stabilized against disturbances, by constantly or periodically measuring its actual value;

## B.      NATURE AND FUNCTION OF A COMMERCIAL HVAC SYSTEM

An HVAC system is an automatic control system, meaning that it achieves and maintains against disturbances the desired (set) room temperature.[2]  A commercial HVAC system typically includes the following major components:

    a.  A chiller to cool and/or a boiler to heat water for use in the air handling units of the system;

    b.  Air handling units, typically one for each floor or other major area, that include pipes, valves, water pumps, and heat-exchange coils, ducts, dampers, and fans;

---

[2] HVAC systems and components are described in Defendant's Response to Plaintiff's Request for Admissions (JA 96-100) and in the transcript of deposition testimony of plaintiff's fact witness Michael Martinelli (hereafter M. Dep.") of June 5, 2012, at JA 137-157 and 222-223.  *See also* transcript of deposition testimony of plaintiff's expert witness Stephen Fairfax (hereafter "F.Dep.") of June 5, 2012, at JA 361: [line]14-363:17, 365:10-369:5; JA 490-533.

c.  Thermostats in the spaces served by air handling unit vents; and

d.  Actuators that change the position of valves and dampers to change the amount of water and air that flows through the system.[3]

A commercial HVAC system typically operates as follows:  A thermostat[4] containing a temperature sensor senses whether the temperature of the ambient air in the room matches the "desired" (set) temperature.  The thermostat signals an HVAC controller when the measured temperature varies a pre-programmed amount from the desired temperature.  The controller controls the operation of the HVAC boiler, chiller, and actuators in order to ensure that temperature-controlled water is pumped through pipes to heat or chill air that is blown through ducts to heat or cool the ambient air within the room.

Actuators are connected by drive shafts and gears to valve plugs or damper blades which rotate within their range of operation (usually 90°) in order to increase or decrease the flow, and consequently the temperature of air in the room into which the air is vented.   Rotation of the motor coil winding in the actuators causes a corresponding rotation of the drive shafts and gears, *and* the

---

[3] EN 8501 describes "valve actuators, electrical" as apparatus "consisting of an electric motor with reducing gear and drive shaft and, in some cases, with various devices (electric starter, transformer, hand-wheel, etc.) to operate the valve plug."  A damper actuator is the same apparatus connected to a damper blade rather than a valve plug.

[4] EN 9032(I) exemplar (A) identifies and describes a thermostat as an instrument for automatically controlling or regulating temperature that is classifiable under HTSUS heading 9032.

valve plugs or damper blades to which they are connected – all act in unison.  JA 100; M.Dep. JA 201:12-22.

In designing an HVAC system, the maximum flow of each pipe and duct is calculated based on the interior dimension of the conduit and rate of flow generated by the installed pump or fan.  Knowing the maximum unobstructed flow, one can calculate the proportional flow represented by each position of the valve plug or damper blade within its 90º range of operation – from closed to 100% open.[5]  The position of the motor winding in the subject merchandise bears a mathematical relationship to the flow, such that the subject merchandise

_____

[5] During deposition, plaintiff-appellant's expert witness Stephen A. Fairfax explained how the flow of a liquid or gas is measured in an HVAC system:

> A.      … That's typically measured in two different instances.  One would be at the design of the damper.  So whoever produces the damper provides with it a set of specifications or curves or tables that say, "If I have this much pressure, and I open the damper so much, I get this much flow.  So … the design of the system has given a relationship between position of the damper and flow which they can use to control, to effect the control of, temperature in a room.
>
> <div align="center">* * *</div>
>
> A.      In most buildings, after the building is completed and is undergoing what's called commissioning, which means checking that all the systems work as they are supposed to, there is a process sometimes referred to as balancing, sometimes referred to as just commissioning, where people go around and actually check the flow of cool or warm air out of the various outlets.
>
> Q.      Is flow measured at any point after the system is in place?
>
> A.      In some systems it is.

F.Dep. JA  357: 2-13; 358: 10-20, and M.Dep. JA201:8-203:12.

measures and changes the position of the motor winding in order to control flow. F.Dep. JA 356:3- 359:5.

## C.    DESCRIPTION OF THE SUBJECT MERCHANDISE

Standard actuators are electric motors with reducing gears and a drive shaft.  In an HVAC system, standard actuators only turn the motor on and off in response to electric current commands from the central controller.  F.Dep. JA 396:19-397:5.  The controller, not the actuator, identifies the present position of the actuator motor winding and calculates the degree of rotation needed to re-position the valve plug or damper blade in order to adjust flow.[6]  A standard actuator cannot position a valve plug or damper blade independently of the HVAC controller because it lacks the independent capacity to measure, calculate, and control the valve plug or damper blade to which it is attached. M.Dep. JA 235:3-236:9.  Essentially, the standard actuator is a drone that fulfills commands from the HVAC controller.

The subject merchandise, however, is not a standard actuator because it incorporates a programmed Application Specific Integrated Circuit ("ASIC") in addition to the components of a standard actuator.  The presence of the programmed ASIC enables the subject merchandise to monitor and maintain the

---

[6] Flow is one of the variables that an HVAC system uses to adjust or maintain room temperature.  M.Dep. JA 221:7-23.

desired setting of the valve plug or damper blade by taking action independent of any command from the HVAC controller. It fundamentally changes the character and function of the instrument.[7]  F.Dep. JA 348:17-350:13, 394:4-398:7, 402:12-406:5.


### D.   FUNCTION OF THE SUBJECT MERCHANDISE

The subject merchandise is able to adjust and maintain flow independently of the HVAC controller because the following functional capabilities are present in the ASIC prior to importation:

(1) Measure the current position of the damper blade or valve plug,

(2) Compare the measured position with the desired position,

(3) Move the damper blade or valve plug to the desired position, and

(4) Stabilize the present position of the blade or plug against unwanted disturbances.

---

[7] The Belimo devices have moved some automatic control functions from a central control computer closer to the point of control, which is roughly analogous to networks of PCs now used to perform computing tasks once the exclusive province of mainframe computers.

With respect to commercial HVAC systems, the falling price of computers and the rising price of installed cable during the past 20 years have caused the "intelligence" once confined to the central controller to become distributed towards the edge of the control system, closer to the controlled appliances. The ASICs in the subject merchandise is an example of how a programmed microprocessor can replace a general purpose computer in performing automatic HVAC control functions.  F. Dep. JA 504-505.

*All models* of the subject merchandise measure, calculate, and recognize the current position of the motor winding (valve plug or damper blade). M.Dep. JA 164:3-169:19; F.Dep. JA 369:6-374:19, 517-528. Different models of the subject merchandise employ different methods of measurement.[8] The programmed microprocessor in each ASIC converts that raw measurement data into data representing the angle or percentage of range of rotation of valve plug or damper blade in order to compare it to the "desired" position. The subject merchandise performs the measurements and calculations independently - without any additional signals from the HVAC controller.

The ASIC in the subject merchandise identifies the current motor winding (valve plug or damper blade) position as an electric pulse count. Within its range of operation (usually 90 degrees), the pulse count may range from, e.g., zero (fully closed - 0°) to 90,000 (fully open – 90°). F.Dep. JA 398:15-25. The ASIC memory stores the pulse count of the current position, and it has recorded

---

[8] All models of the subject merchandise incorporate within the ASIC "back electro-motive force ("BEMF") detection capability to measure current position by counting the pulses of electrical voltage emitted by the motor winding as it rotates. A position counter within the ASIC calculates valve plug or damper blade position based on the number of pulses recorded. F. Dep. JA 520. Some models of the subject merchandise also incorporate other measuring devices: either a potentiometer that measures the electrical resistance which is a function of rotation or a Hall Sensor that counts the magnetic poles of the motor winding as it rotates. Measurements collected by the BEMF, potentiometer, or Hall Sensor are denominated in pulses or ohms. F.Dep. JA 350:3-13, 351:4-10, 363:18-364:24, JA 501-502.

in its memory the pulse count of the full open position. Martinelli Affirmation, JA 115-116. *The subject merchandise measures motor winding position for only one reason: it corresponds exactly to gear position and, consequently, to valve plug or damper blade position.* M.Dep. JA 200:22-203:12.

When the HVAC system is activated, the ASIC in the subject merchandise adjusts the position of the damper or valve to achieve the flow desired by the central controller. Once the desired position is achieved, the subject merchandise continues to apply enough power to the electric motor to confirm continuously that current position pulse count equals desired position pulse count. All models of the subject merchandise continuously[9] apply power to the electric motor in order to create the holding torque used to maintain the desired position against unintentional electrical or mechanical disturbance (e.g. wind gust). F.Dep. JA 387:15-391:16. At the same time, all models continuously measure and calculate current position in order to detect and eliminate any deviation. M.Dep. JA 178:19-25; 180:11-184:24; F.Dep. JA 390:21-392:22.

If the ASIC detects that the measured position varies a pre-programmed amount from the desired position, it controls the electric motor to restore the desired position of the valve plug or damper blade. Unlike a thermostat, all of

---

[9] ASIC performs the measuring and calculating functions at close to 10,000 checks per second and instantly detects and eliminates any variation from desired position. Martinelli Affirmation JA 116, F.Dep. JA 399:2-400:7.

this activity occurs within the subject merchandise without any further signal from or action by the HVAC controller. The subject merchandise, not the HVAC controller, confirms that desired position is reached and maintained. F.Dep. JA 417:11-419:16.

Occasionally the subject merchandise may experience a power failure, loss of communication with the HVAC controller, or may receive an alarm signal. The subject merchandise has been programmed to respond to these off-normal conditions by taking action independent of the HVAC controller to position the valve plug or damper blade either during or after the power failure, or both. The specific actions include conserving energy stored within the subject merchandise, assisting the electric motor to start using this stored energy, and then controlling the speed of the motor to best achieve the new desired position during loss of outside power.

An example of how the subject merchandise functions would be helpful at this point. Assume that a disturbance such as a strong draft moves the fresh air intake damper blade out of position so that the air flow changes unintentionally. Since the subject merchandise constantly monitors the position of the damper blade based on its relation to changes in motor winding position, the subject merchandise immediately recognizes the change in degrees (motor winding rotations) from the desired position. The subject merchandise calculates exactly

how much to adjust the position of the damper blade (motor winding position) to restore it to desired position and thus to restore the desired air flow.  M.Dep. JA 57:18-58:9, 60:19-66:8, 115-117 and F.Dep. JA 400:8-402:11.  The *actual value (position)* of the plug or blade indicates *the actual value of flow* within the HVAC pipe or duct as a percentage of the known maximum flow through the pipe or duct.  Thus, the subject merchandise indirectly measures flow and automatically controls it.  It is a single apparatus consisting of integrated measuring device, control device, and starting, stopping, and operating device.  *The subject merchandise performs these functions independently from the HVAC controller.*

### E.    THE CIT DECISION ON APPEAL

In its decision, the CIT agrees as follows with Belimo's description of the function of an HVAC system, and the functions of the subject merchandise:

> An HVAC system typically includes sensors that measure the ambient air temperature of spaces in a building.  A central controller receives and processes signals from sensors and compares those signals to a pre-set, desired temperature for a given space.  The central controller then signals to a motor to reposition an attached valve to change the amount of heated or cooled water that can flow through a water handling unit that serves the space.  The temperature in the water handling units affects the air temperature within air handling units that also serve that space.  Meanwhile, the central controller signals to a motor to reposition an attached damper to change the amount of heated or cooled air that can flow through the ductwork into the space that the air handling units serve. …

The ASIC connects to and monitors the position of the motor. By monitoring the motor's position, the ASIC can calculate the position of the gears in the subject merchandise, which corresponds to the position of the attached valve or damper. The ASIC compares the calculated gear position with the desired position that it receives from the central controller. It then calculates the motor operation required to rotate the gears so that the damper or valve will move to the desired position. ASIC then activates the motor, thereby turning the gears in the subject imports and repositioning the damper or valve until it reaches the desired position. …

The ASIC also performs certain functions independently. For example, it monitors the subject imports' motor periodically and continuously, even absent a signal from the central controller. Using the inputs from this monitoring, the ASIC can independently prevent and reverse unintended movement from the desired position. Additional examples of the ASICs independent functions include its ability to adapt to receive an AC or DC signal from the controller, filter out unintended electrical signals, and use stored energy to prevent the motor from spinning out of control when the power fails.

JA 8-10 (record citations and text headings omitted).

Thus, the CIT found that the subject import contains a programmed electronic microprocessor called "the ASIC" that enables the subject merchandise to "independently monitor" the position of its electric motor coil windings. The court recognized that the position of these windings determine the position of the damper and valves to which they are attached, which determines the amount of water and air flow in the system.

In the second and third paragraphs set forth above, the court describes what it calls the "independent" functions of the subject merchandise: identification of the current and desired positions of the valve plug or damper

blade within its range of rotation, and control of motor operation required to achieve and maintain the desired position received as a signal from the HVAC controller. To conclude that the subject merchandise performs these functions "independently" of the HVAC controller is to concede that it performs them *automatically*.[10]

While the court's factual recitation set forth above is correct, the court committed reversible error in its interpretation of the statute and application of the statute to the subject merchandise. In this regard, the court found that the terms "factor" and "variable" in Note 7(a), meant the same thing, stating that these words "may be used synonymously or, as in this case, one may be used as shorthand for the other, when the other is extensively modified." JA 16. As a result of its conclusion that the word "factor" referred to the words "variable to be controlled" found in Note 7(a), the CIT held that heading 9032 was limited to products that provided an "external measurement" of the *"actual value"* of the variables to be controlled (e.g. the flow), and that -

> at no point do the subject imports measure the variable (i.e., the temperature, flow, pressure, or otherwise) sought to be controlled and make adjustments as a result of comparing such *external* measurements to the desired temperature, flow, pressure or otherwise.

---

[10] The common meaning of "automatic" is "acting or operating in a manner essentially independent of external influence or control" or "self-regulating." American Heritage On-Line Dictionary *available at* www.ahdictionary.com (last accessed Jan. 20, 2014).

JA 18, record citations omitted; italics added. Characterizing the electronics in the subject merchandise as a controller of *motor position* rather than *flow*, the court held that the subject merchandise was classifiable under heading 8501 as an electric motor. JA 21.

The CIT misclassified the subject merchandise due to its misinterpretation of HTSUS chapter 90 Note 7(a) and Harmonized Tariff System ("HTS") Explanatory Note ("EN") 9032(I).[11] The court failed to consider the significance of all of the terms of Note 7. The court failed to take into account the legislative history of Note 7 which makes it clear that heading 9032 was to be broadly construed to include controllers that directly or *indirectly* control variables. Properly interpreted, the Note and the EN clearly provide for classification of the subject merchandise under HTSUS heading 9032 as an instrument for automatically controlling flow.

---

[11] The EN is the official interpretation of the international nomenclature down to the 6-digit subheading level of the tariff. While not legally binding on the court, they represent the considered view of the classification experts on the Harmonized System Committee of the World Customs Organization. The courts have frequently consulted and been influenced by the EN. *See, e.g, Lynteq, Inc. v. United States*, 976 F. 2d 693, 699 (Fed. Cir. 1992), *Mita Copystar Am., Inc. v. United States*, 21 F. 3d 1079, 1082 (Fed Cir. 1994); *Len-Ron Mfg. Co. v. United States*, 334 F. 3d 1304, 1309 (Fed. Cir. 2003); *Rollerblade, Inc. v. United States*, 112 F. 3d 481, 486 (Fed. Cir. 1997).

## SUMMARY OF ARGUMENT

As explained below, the subject merchandise satisfies every requirement of Note 7(a), when the Note is properly interpreted in light of the legislative history, the relevant science of automatic control, and EN 9032.  The CIT incorrectly held that heading 9032 is limited to automatic controllers that externally measure a variable sought to be controlled (e.g. flow), and compare this external measurement to the desired level to be achieved.  The court never explains what the term "external measurement" means, but from the context in which it is asserted, it appears to require a direct measurement of the variable that is to be controlled (in this case a direct measurement of flow). The court's conclusion excludes from HTSUS heading 9032 a very large group of automatic controllers that *indirectly* measure and automatically control one or more of these variables. This very narrow interpretation is contrary to the plain meaning of the words of the statute, EN 9032, the legislative history of these tariff provisions, and authoritative sources that explain the operation of automatic control systems and instruments.

Moreover, if the Appellate Court agrees that a direct measurement is required, then contrary to the CIT finding, the subject merchandise *does* measure the "actual value" of flow.  It does so *indirectly* by measuring the position of the valve plug within the pipe or damper blade within the duct in which it is

positioned.  This is an "*external measurement*" of flow because the *plug or blade is immersed in the flow*.  In making its determination, the court totally ignores the fact that; (1) the motor winding position has a corresponding effect on the position of the valve plug or damper blade; and (2) the valve plug or damper blade position corresponds to flow as mathematically calculated and built into the design of the HVAC system.  Therefore, the subject merchandise does monitor and automatically control flow.

The CIT also erred in classifying the subject merchandise as an electric motor under heading 8501.  The programmed ASIC changes the character and function of the subject merchandise from electric motor to automatic flow controller or regulator because all components of the subject merchandise perform together the *single function* of automatic flow control within the HVAC system.  Thus, the subject merchandise is fully and specifically described in and classifiable under heading 9032 pursuant to HTSUS General Rule of Interpretation ("GRI") 1.

## ARGUMENT

### A.   STATEMENT OF THE STANDARD OF REVIEW

The meaning and scope of proposed tariff headings and subheadings presented in this appeal are purely questions of law which this Court decides *de novo* and without deference.  *Deckers Corp. v. United States*, 532 F. 3d 1312,

1314 (Fed. Cir. 2008); *Metchem, Inc. v. United States*, 513 F.3d 1342, 1345 (Fed. Cir. 2008); *Carl Zeiss, Inc. v. United States*, 195 F. 3d 1375, 1378 (Fed. Cir. 1999). This Court reviews *de novo* a CIT decision on a motion for summary judgment. Decisions on summary judgment do not involve judicial "findings of fact" because decisions on summary judgment are only made in cases where the judge determines that there are no material facts in dispute. *Processed Plastics Co. v. United States*, 473 F. 3d 1164, 1168 (Fed. Cir. 2006).

The only issue in this appeal of a decision on summary judgment is the proper interpretation of the classification terms at issue and whether the scope of those terms encompasses the subject merchandise. These are matters involving interpretation of law and undisputed facts. *Outer Circle Products v. United States*, 590 F. 3d 1323, 1326 (Fed. Cir. 2010). The Court determines the meaning of the tariff terms and their scope in relation to the undisputed characteristics, functions, and uses of the subject merchandise. *Bausch & Lomb v. United States*, 148 F.3d 1363, 1366 (Fed. Cir. 1998) .

### B. HEADING 9032, AS DEFINED BY NOTE 7 AND EXPLAINED BY EN 9032, DESCRIBES THE SUBJECT MERCHANDISE

Heading 9032 covers automatic regulating or controlling instruments and apparatus; parts and accessories thereof.

### 1. Note 7(a) Supports Classification as an Automatic Controller

Chapter 90 Note 7(a) states that HTSUS heading 9032 applies to:

(a)  Instruments and apparatus for automatically controlling the flow, level, pressure or other variables of liquids or gases, or for automatically controlling temperature, whether or not their operation depends on an electrical phenomenon which varies according to the factor to be automatically controlled, which are designed to bring this factor to, and maintain it at, a desired value, stabilized against disturbances, by constantly or periodically measuring its actual value;

Simply stated, the subject merchandise is encompassed by the plain meaning of the terms of Note 7(a).  The government has admitted that the subject merchandise is an instrument or apparatus.  JA 95-96.  In *Kanematsu USA Inc. v. United States*, 185 F. Supp. 2d 1364, 1374 (CIT 2002), the court defined "apparatus" as "a compound instrument designed to carry out a specific function," based on *McGraw-Hill Dictionary of Scientific and Technical Terms* (5th ed. 1994).

Based on the trial court's decision, there is also no doubt that the subject merchandise is a component of an automatic HVAC control system that indirectly controls the flow of fluids or air through the system by directly and *automatically* controlling the position of the valve plug or damper blade to which it is mechanically attached.

It automatically controls the flow of liquids or gases by means of an "electrical phenomenon."  The electrical phenomenon is the electrical pulses

produced by rotation of the motor windings, which corresponds to changes in valve plug or damper blade position. The instrument or apparatus "constantly or periodically" monitors changes in motor winding (valve plug or damper blade) position in order to automatically control and stabilize flow. Thus the subject merchandise falls within the plain meaning of the words of the statute.

### 2. EN 9032(I) Supports Classification of the Subject Merchandise as an Automatic Controller of Heading 9032

EN 9032 (I) provides greater insight as to the products covered by

Heading 9032 when it states:

> **Automatic control apparatus for liquids or gases and apparatus for automatically controlling temperature** form part of complete automatic control systems and consist essentially of the following devices:
>
> (A) A **device for measuring** the variable to be controlled (… temperature in a room, etc.); in some cases, a simple device which is sensitive to *changes* in the variable (metal or bi-metal rod … etc.) may be used instead of a measuring device.
>
> (B) A **control device** which compares the measured value with the desired value and actuates the device described in (C) below accordingly.
>
> (C) A **starting, stopping or operating device**.
>
> Apparatus for automatically controlling liquids or gases or temperature, within the meaning of Note 7(a) to this Chapter, consist of the three devices forming a single entity or in accordance with Note 3 to this Chapter, a functional unit.

Bolded in original; italics added. EN 9032(I) also specifies that the automatic control apparatus -

> are connected to an appliance which carries out the orders (pump, compressor, valve, furnace burner, etc.) which restores the variable (e.g., liquid measured in a tank or temperature measured in a room) to the prescribed value, or which, in the case of a safety system, for instance, stops the operation of the machine or apparatus controlled. The appliance, generally remote controlled by a mechanical, hydraulic, pneumatic or electric control, is to be classified in its own appropriate heading (…valve: **heading 84.81**, etc.) …

The subject merchandise is clearly an instrument or apparatus consisting of an integrated group of devices used for the particular purpose of controlling flow. It is connected to an appliance (valve or damper) which carries out the orders of the subject merchandise to restore the variable of flow and, consequently, the variable of temperature measured in a room. Consistent with the terms of EN 9032(I), the subject merchandise contains:

- A *measuring devi*ce that constantly measures changes in the actual position of the valve plug or damper blade,

- A *control device* that computes and compares actual to desired position, and

- A *starting, stopping, and operating device*: switches that rotates the electric motor independent of a signal from the HVAC controller as necessary to restore the external appliance (valve plug or damper blade) to the desired position, stabilized against disturbances.

Against this background, it is clear that the subject merchandise is an automatic controller of flow as described by EN 9032 (I).

21

### 3. The Subject Merchandise is an Automatic Flow Controller in Safety Applications which is Identified as an Exemplar in EN 9032(I)

EN 9032(I) includes exemplars of automatic controllers that are covered by heading 9032. EN 9032(I) states that automatic control apparatus are used in safety systems by, for instance, "[stopping] the operation of the machine or apparatus controlled." The subject merchandise controls an apparatus that the EN identifies as the "appliance," in this case the valve plug or damper blade, which can – depending on where in the system it is installed - fully allow or shut off the flow of air through the HVAC ducts, fuel to the HVAC boiler, or water to the HVAC chiller.

First, the electric override control function built into each model of the subject merchandise enables it to move the valve plug or damper blade *automatically* to a pre-programmed position based on data stored within its microprocessor (part of the ASIC) in order to exhaust toxic smoke, intake fresh air, or pressurize escape routes (e.g., stairwells) in the event of fire or other emergency. [12] Standard actuators do not have this function. M.Dep. JA 187:2-24; F.Dep. JA 521-522.

---

[12] In addition to electric override control, all models of the subject merchandise incorporate a *manual override button* which allows the person operating the HVAC system to manually move the valve plug or damper blade to any desired position. Manual override control is described in the EN 8501 description of

Second, the built-in <u>automatic return function</u> enables all models of the subject merchandise to return <u>after termination of electric, manual, or mechanical override</u> to the previous desired position without any signal from the controller. F.Dep. JA 392:15-394:3. The subject merchandise accomplishes this result by employing its stored data of current and desired position, calculating the motor function required to close the gap, and activating its electric motor (operating device) to restore the desired position. Standard actuators do not have this function.

Third, each <u>spring return model of the subject merchandise</u> automatically takes two actions designed to activate the operating device (electric motor) to dislodge the valve plug or damper blade from its current position as spring action takes hold. When the ASIC detects that power has failed, the spring return model immediately conserves the energy stored in its capacitor by turning off non-essential functions and using the stored energy to "kick start" the motor in the direction the damper is designed to move (full open or closed). Since many safety valves and dampers spend months or years in the same position and can stick in position, this kick start increases the probability that the damper *will*

---

"valve actuator, electrical" as a "hand wheel" for manual valve plug control. *Spring return models* of the subject merchandise also have stored mechanical energy in a built-in spring mechanism that is designed to move the valve plug or damper blade to full open or closed position in the event of power loss.

move to the desired position when power fails.  As the spring mechanism that moves the valve or damper causes the electric motor windings to spin, the ASIC is programmed to make the motor serve as a generator that *converts a small part of the spring's energy into electrical energy in order to keep the ASIC functioning*.  While the damper is moving by spring action, the ASIC *automatically measures and regulates the motor rotation speed*.  Without the ASIC, the motor spin could accelerate to the point of causing the motor to fly apart and possibly jam the damper.  F.Dep. JA 520, 522-523.  Electric motors (standard actuators) do not have any of these capabilities.

To reiterate, when power is restored after power loss, *all models* of the subject merchandise *automatically* compare the current position with the last position that had been established by the intentional signal from the HVAC controller *in order to automatically restore that desired position*.  F.Dep. JA 393:3-394:3.  Electric motors (standard actuators) do not perform this function.

**4. The Subject Merchandise is an Automatic Draft Regulator which is Identified as an Exemplar in EN 9032(I)**

EN 9032(I) paragraph (F) identifies <u>*oven draught ("draft") regulators*</u> as an exemplar of an automatic control instrument classifiable in heading 9032, HTSUS.  The EN describes them as instruments that "are used, for example in central heating or air conditioning plants, to control automatically the air intake

24

by reference to the temperature, pressure, etc." Oven draft regulators automatically control air intake "*by reference to*" a controlled variable. The phrase "by reference to temperature, pressure, etc." in EN 9032(I) does *not* specify that the instrument *directly* measure and control any one of the "variables of" air. The words chosen in the EN are consistent with the legislative history and scientific underpinnings of Note 7(a) explained below. Oven draught regulators react to flow by directly controlling a "factor" (motor winding rotation – the direct and manipulated variable) that in turn controls flow and, consequently, temperature (indirect variables).

Plaintiff's expert witness explained in detail in his deposition testimony how an automatic oven draft regulator works:

Q. …[A]re there any features that are common across the board to every oven draught regulator with which you are familiar?

A. Well, all of them incorporate some means to control the draught, the flow or pressure of air.

Q. Okay. Is there a commonality in how that control feature is triggered?

A. There I'd have to say no. There's a wide variety. In the simplest systems, in residential systems, it's triggered primarily by flow with a safety system that shuts off the burner if it doesn't ignite in a certain amount of time.

In a building like this, some of them, for example, might try to regulate the composition of exhaust gases without temperature, just look at the exhaust gases. Other[s] might actually try and look at temperature of exhaust gases. Others still might try to just match the flow of air to be proportional to the flow of fuel. So it's really quite a range. …

What's common about oven draught regulators is that they … don't measure flow directly. They … control their intake by the temperature, by reference to flame, by reference to fuel flow, by reference to any number of other variables. …

Q.    If a draught regulator is intended to regulate draught … and these products are intended to regulate position, can you explain what you mean by "the merchandise functions as an oven draught regulator"?

A.    Well, because they meet the definition laid out in explanatory note 9032. They are used in a central plant and they control air intake, in this case, the air … coming into the room, being pushed into the room by reference to temperature, pressure, etc. So they match the description literally word for word.

F.Dep. JA 428:20-434:3. Thus, the oven draft regulator can control air flow by controlling ("by reference to") the temperature, pressure, or volume of the intake air flow. F.Dep. JA 422:17-428:19 and 508-509.

In his affirmation , Mr. Fairfax clarifies (¶ 9) that, like any other automatic controller or regulator of air flow, an oven draft regulator controls air intake by measuring and controlling the position of a damper. F.Affirmation JA 719-721. Thus, oven draft regulators work in the same way and use the same principles as the subject merchandise. In fact, Mr. Fairfax explains in paragraph 10 of his affirmation that certain models of the subject merchandise are specifically suitable for use as oven draft regulators. JA 720-721 and 578-579.

### C. The Legislative History of Note 7 Clarifies that Heading 9032 Covers Instruments or Apparatus that Directly or Indirectly Control the Variables Flow and Temperature

The HSC agreed as early as 1982 "that the new heading 90.32 would cover automatic regulators of all types." HSC Doc. 28.800 (Summary Record of the 28th Session of the Harmonized System Committee and of its Working Party" August 2, 1982), Annex IV/1 at para. 46. At that time, the HSC Working Party adopted the following "new Note 5" to chapter 90 "to define the scope of heading 90.32":

> 5. Heading No. 90.32 applies only to:
>
> (a) Instruments and apparatus for automatically controlling the flow, depth, pressure or other variables of liquids or gases, or for automatically controlling temperature, whether or not their operation depends on an electrical phenomenon which varies according to the factor to be automatically controlled; and
>
> (b) Automatic regulators of electrical quantities, and instruments or apparatus for automatically controlling non-electrical quantities the operation of which depends on an electrical phenomenon varying according to the factor to be controlled.

*Id.*, para. 48.

In 1994, the HSC acknowledged that this Note (re-numbered Note 6) "should be amended to specify more clearly the apparatus falling in heading 90.32" and that for this purpose "Note 6 could be amended along the lines of the

text of Explanatory Note 90.32." As relevant here, the record of the proceedings state:

8.     Note 6 to Chapter 90 stems from Note 5 to the same chapter in the CCCN. The latter Note, which was subdivided into parts (a), (b), (c), and (d), specified the scope of (CCCN) heading 90.28. When Chapter 90 was restructured during the drafting of the HS, … the contents of heading 90.28 (CCCN) were split into a number of headings, including two new headings (90.30 and 90.32) …

9.     The proposed new heading 90.32, created to cover "automatic regulators," encompassed the contents of Note 5(d) [CCCN], which actually had the same wording as present Note 6(b). However, there was an objection that automatic regulators, specifically mentioned in Note 5(d) to Chapter 90 [HS], could also be covered … as electrical appliances or apparatus of a kind described in heading 90.24 ("Instruments and apparatus for ….. checking or automatically CONTROLLING the flow, depth, pressure or other variables of liquids or gases, or for automatically controlling temperature (for example, thermostats ….)." This viewpoint was supported and it was decided that heading 90.32 would cover all types of automatic regulator. To avoid confusion as to whether devices operating by simple electrical contact (e.g., thermostats) were covered by the expression "automatic regulators," the HSC decided at the time to include a reference to "automatic control" in the text of heading 90.32 …

10.    … [T]he scope of the new heading 90.32 was considered ambiguous, and the HSC consequently decided to adopt a new Chapter Note 5. This Note finally became the present Note 6 …

12.    The scope of Note 6(a) *is limited to instruments and apparatus for controlling certain properties, independently of the way in which they operate, which may be electrical, mechanical, hydraulic, pneumatic, etc. S*ome of these products are very simple, such as certain types of thermostat, for example. In principle, a basic thermostat comprises only a temperature gauge, a device for presetting the desired temperature and a stopping device. It can be seen from the above that such a thermostat does not comprise a CONTROLLING device per se, in the sense that it is directly operated by a switch when the desired value is reached. The devices of a thermostat do, however, enable it to bring the temperature to

28

be regulated to a desired value and to maintain it, stabilized against disturbances. …

14.     It is clear from the above that the Note at issue covers two groups of apparatus comprising mainly devices of the same type.  These are devices for measuring, a CONTROLLING device and a starting, stopping or operating device (see Explanatory Note 90.32, pages 1534 to 1536).

15.     It should be pointed out that these groups of instruments and apparatus do not necessarily comprise all the devices mentioned above (see paragraph 12).  However, they do in principle carry out the same function of automatically regulating or CONTROLLING, which is to bring a factor to be controlled to, *and maintain it at,* a desired value, stabilized against any disturbances, by constantly measuring its actual value.

16.     The Secretariat thus proposes adding a description of the joint function (mentioned in paragraph 15) to Note 6(a) and 6(b) to Chapter 90.

17.     The description indicated in paragraph 15 above contains the expression "constantly measuring."  In this respect, the Secretariat feels that the term "or periodically" should be added, given that a large number of these instruments or apparatus of heading 90.32 comprise digital elements (eg. microprocessors), whose function is, by their very nature, periodic (in other words intermittent or discontinued).  The possible inclusion of this alternative wording is supported by the related technical literature.

Closed-loop control system

"A system in which the value of some output quantity of the system is continuously or underlined periodically measured and used to manipulate another quantity, an input to the system, in such a way as to make the first quantity or some other dependent output follow a desired pattern of values.  At each instant the measured value is compared to the desired value of the measured quantity.  The difference is used to change the value of an input to the system.  Such systems are also called feedback control systems, because the measured value is fed back, to be used to manipulate and input quantity." (McGraw-Hill Encyclopedia of Science & Technology, 5th Edition).

18.    In the light of the foregoing, the Secretariat proposes … to add the following text to Note 6(a) and 6(b) to Chapter 90 "designed to bring this factor to, and maintain it at, a desired value, stabilized against any disturbances, by constantly or periodically measuring its actual value."

19.    *The Secretariat points out that these amendments would not entail any transfer of goods between headings, and would serve only to provide a more precise legal basis for the classification of products in heading 90.32.*

HSC Document 39.157 E (HSC Review Sub-Committee, 11th Session, Brussels, 16 December 1994); bolded and underlined in original; italics added.

This legislative/drafting history of Note 7 confirms that HTSUS heading 9032 is intended to include instruments and apparatus employing a wide range of electrical and non-electrical methods of automatic control.  The automatic control apparatus of heading 9032 include the subject merchandise, which operates both *electrically and mechanically* to automatically control the desired flow of liquids or air within the automatic HVAC *system*.

The fact that paragraph 17 quotes from the *McGraw-Hill Encyclopedia of Science & Technology* clearly indicates that *Note 7 is intended to conform to scientific principles of automatic control of variables.*   In addition, the *McGraw-Hill* explanation of a closed-loop automatic control system perfectly describes the subject merchandise to a tee: it "continuously or periodically

measures … some output quantity of the system" (motor winding pulses) in order to "manipulate another quantity, an input to the system" (valve plug or damper blade position) "in such a way as to make the first quantity *or some other dependent output* [flow] follow a desired pattern of values. … The difference is used to change the value of an input to the system [valve plug or damper blade position]."

This legislative history demonstrates that the HSC intended interpretation of chapter 90 Note 7 and heading 90.32 to conform to the science of automatic control instruments and systems. The narrow interpretation inherent in the CIT opinion would exclude large numbers of automatic controllers from the tariff heading broadly termed "automatic regulating and controlling instruments and apparatus," which was not the drafters' intent.

### D. Note 7 Conforms to Scientific Principles of Automatic Control

Although the meaning of Note 7 is a matter of statutory interpretation, the legislative history of the Note demonstrates that there is no reason to divorce interpretation of the Note from the commonly recognized scientific principles that explain the characteristics and function of automatic control instruments. Belimo's interpretation of Note 7 is consistent with the science of automatic control instruments and systems, as clearly indicated in the legislative history set

forth above, and as clearly explained in recognized scientific authorities.[13]

As noted above, in discussing automatic control systems covered by Note 7, the HSC quotes the *McGraw-Hill Encyclopedia of Science & Technology* definition of a "closed-loop control system." The *McGraw-Hill Dictionary of Engineering (2nd edition)* 212-213 defines a closed-loop control system as a "*feedback control system*," which it describes as –

> A system in which the value of some output quantity is controlled by feeding back the value of the controlled quantity and using it to manipulate an input quantity so as to bring the value of the controlled quantity closer to a desired value. *Also known as closed-loop control system.*

Italics added. The same dictionary defines "controlled quantity" as "controlled variable," which in turn means, "in process automatic-control work, that quantity or condition of a controlled system that is *directly* measured or controlled." *Id.* at 126 ("controlled variable"), italics added.

---

[13] The courts have frequently relied on published scientific authorities such as those cited above for definition and explanation of technical tariff terms. In *Samsung International, Inc. v. United States*, 887 F. Supp. 2d 1330, 1338 (Ct. Int'l. Trade 2012, *aff'd.* 2013 U.S. App. LEXIS 24261, 35 Int'l. Trade Rep. (BNA) 2215 (Fed. Cir. 2013), this Court stated that it "adopts the reasoning of the CIT in all respects." The CIT had stated in its opinion, "When the HTSUS and its legislative history do not define a tariff term, the correct meaning is the common meaning. *Rocknel Fastener, Inc. v. United States*, 267 F. 3d 1354, 1356 (Fed. Cir. 2001) … 'To ascertain the common meaning of a term, a court may consult 'dictionaries, scientific authorities, and other reliable information sources' and 'lexicographic and other materials.' *Id.* at 1356-57 (*citing Simod Am. Corp. v. United States*], 872 F. 2d [1572] at 1356-57)."

In terms of this *McGraw-Hill* explanation, the subject merchandise controls an "output quantity" (flow) "by feeding back the value of the controlled quantity" (motor winding pulses) "and using it to manipulate an input quantity" (valve plug/damper blade position) "so as to bring the value of the controlled quantity closer to a desired value" (position within range of rotation, which represents flow). As applied in this case, the *McGraw-Hill* definition of a feedback or closed-loop control system clearly describes the function of the subject merchandise – direct measurement and feedback of position value for the purpose of automatically controlling flow.

*Van Nostrand's Scientific Encyclopedia* (7th ed. 1989),vol. 1 at 753-756 ( "*Van Nostrand's*") is also very helpful in this case, as it explains that modern automatic control systems are designed to process and manipulate different types of variables in order to achieve a desired result. *Van Nostrand's* describes the "process variable" as "[t]he quantity or characteristic that is the *object of measurement* in an instrumentation or automatic control system" and explains that the object of measurement may be any one of the following types of variables in a "Controlled System (or Process)":

> **Variable (Directly Controlled).** In a control loop, that variable whose value is sensed to originate a feedback signal.

> **Variable (Indirectly Controlled).** A variable that does not originate a feedback signal, but which is related to and influenced by the directly controlled variable…. There are numerous variables

33

that may be controlled, depending on the process involved. A process need not be a process in the normal sense, i.e., a heating, cooling, or reacting process, but for the purposes of definition here also includes machines whose operation is dependent upon the manipulation and control of variables. Variables include: temperature …; pressure; the level of liquids …; the flow of a liquid or gas in a pipeline…. Some typical process operations in which control is important include … heating/cooling….

**Variable (Manipulated).** A quantity or condition that is varied as a function of the actuating error signal, so as to change the value of the directly controlled variable. In any practical control system, there may be more than one manipulated variable.

Id., vol. 1 at 753; bolded in original.

Moreover, where flow control is concerned, *Van Nostrand'* (10th ed. 2008) at p. 1998 *s* (vol. 1 (2008), p.1998) makes it even clearer that control systems often rely on indirect measurement of flow:

There is a vital need to measure the rate of flow of liquids and gases as they move through pipes and conduits … Unlike solid materials, which can be measured directly by counting or weighing, fluids flowing through closed pipes or conduits normally require the measurement of some other variable that bears a mathematical relationship[**14**] with the rate of flow. Thus, in most instances, the flow of liquids and gases is by *inference* – that is, it is *indirect.*

Italics in original.

---

[**14**] The reference to "mathematical relationship" is consistent with use of the word "factor" in the phrase "factor to be controlled" in Note 7(a). *Van Nostrand's* (10th edition 2008), vol. 1, pp. 1881-1882 (vol. 1 (2008) at 1881-1882) explains that "[t]he most common use of this term [factor] is the mathematical one."

Significantly, all of these scientific explanations of automatic control systems and apparatus are completely consistent with the text of Note 7 and its legislative history. The subject merchandise is able to indirectly measure and automatically control the "actual value" of the controlled variable – flow – as specified in Note 7 by measuring valve plug or damper blade position. The "electrical phenomenon" of BEMF produced by motor winding rotation (direct and manipulated variable) varies according to changes in flow, the "factor to be controlled" (indirect variable).

### D. The Trial Court's Interpretation of Note 7 is Incorrect as a Matter of Law

Belimo presented to the trial court the only evidence that was presented in this case. The testimony of Belimo's expert witness, coupled with the lexicographic authorities cited in its Memorandum in Support of Summary Judgment (JA 79) enabled the court to interpret the statute in a manner that consistent with the intent of the drafters set forth above. The court, however, chose to ignore Belimo's cited authorities. The CIT interpreted chapter 90 Note 7(a) based in part on its selected definition of the terms "the" and "factor" in the phrase "the factor to be automatically controlled" and "variable" in the phrase "for automatically controlling the flow … or other variables of liquids or gases." Belimo submits that the trial court's interpretation of the law is incorrect. Even

if deemed to be correct, the subject merchandise satisfies the standard announced by the trial court.

### 1. The Trial Court Incorrectly Interprets Heading 9032

The court concluded that the word "the" in the Note 7(a) phrase "varies according to *the factor* to be automatically controlled" is a word of limitation indicating that "factor" refers back to a noun that was previously mentioned in the statute. In Note 7(a), the reference is "flow … [or] other variables of liquids or gases, or temperature," as use in the introductory phrase of the Note. The court relied on the *Merriam-Webster Dictionary* definition of "the" as a word "used to indicate a person or thing that has already been mentioned or seen or is clearly understood from the situation,"

In addition, based on the *American Heritage Science Dictionary* and the *Dictionary.com* definitions of "variable," the CIT equated the terms "factor" and "variable" in Note 7(a), noting that the words "may be used synonymously or, as in this case, one may be used as shorthand for the other, when the other is extensively modified." JA 16.

Finally, the court concluded from these definitions that automatic controllers in heading 9032 must externally measure the variable to be controlled. The court does not explain how the variable flow is to be "externally

measured," but the court seems to imply that external measurement must be direct rather than indirect.  If that is the court's interpretation of heading 9032, the court's interpretation is incorrect as a matter of law.

First, plaintiff-appellant believes the court selected an inappropriate definition of "the" for use in the context of Note 7(a).  Under the heading "Full Definitions of THE," the Merriam-Webster source used by the court and attached to its Slip Op. 13-144 of November 16, 2013 includes the following alternative definitions:

> **1 … m** – used as a function word to designate one of a class as the best … or most worth singling out … <the pill>
>
> **2 …b (1)** – used as a function word before a noun to limit its application to that specified by a succeeding element in the sentence … <the days of our youth> <didn't have the time to write>

JA 26-27.  Based on this definition, "the" is a word of limitation used to narrow its meaning to the terms of the succeeding portions of the sentence in which it appears.

Second, the Merriam-Webster On-Line Dictionary available at www.merriam-webster.com/dictionary (last accessed January 20, 2014) defines "factor" as "something that helps produce or influence a result: one of the things that causes something to happen."  If a "factor" is "*something* that produces … a result; *one of the things* that causes something to happen," (italics added) then –

37

at least in the context of Note 7(a) - "*the* factor" logically is *the* thing that "produces a result … that causes something to happen."  In this context, the word "the" should be defined as "a function word to designate one of a class as the best … or most worth singling out" (**1m** above)[15] or as "a function word before a noun to limit its application to that specified by a succeeding element of the sentence" (**2b(1)** above).  The application specified by the succeeding element of the sentence in Note 7(a) is "factor *to be automatically controlled*" (italics added).   Under this interpretation, there is not necessarily exact identity of meaning in the words "variable" and "factor."

The general rule of statutory interpretation is that use of different words may indicate an intention to highlight a difference in meaning.  *Bush v. United States,* 655 F.3d 1323, 1330 (Fed. Cir. 2011) ("To interpret 'treatment' to mean 'change [in treatment]' would fail to give proper weight to the words chosen by Congress.");  *Kirkendall v. Department of Army*, 479 F.3d 830, 857 (Fed. Cir. 2007) ("[P]roper weight should be given to the words Congress chose, especially where Congress itself has drawn a distinction in the words it used in the same statute.");  *Richards Med. Co. v. United States,* 910 F. 2d 828. 830 (1990) ("The question is, which definition best invokes the intent of Congress?").

---

[15] *See Warner-Lambert Company v. Apotex Corp. et. al.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003).

The fact that the general definitions of "variable' and "factor" overlap does not mean that in every context they have identical meaning or refer to the same natural phenomenon.  Even in the legislative history set forth above, the drafters of Note 7 consistently used both terms – "variable" and "factor."

The distinction in meaning between "variable" and "factor" in the context of Note 7(a) is highlighted by the two-part structure of Note 7(a).  The introductory phrase "for automatically controlling the flow …" describes *what* the instrument does and the remainder of the Note ("whether or not their operation depends …") describes *how* the instrument does it.  In our case, the Belimo products automatically control flow by an electrical phenomenon — electronic feedback from motor pulses — which enables them to monitor and automatically control the position of the damper or valve — which brings flow and temperature to the desired values.

Plaintiff-appellant's expert witness was asked why he believes "the variables identified at the beginning of the note [Note 7(a)] are different than the factor referred to at the end of the note."  F.Dep. JA 375:12-382:8.  He responded,

> It's not a belief.  It is a fact and a matter of my experience and education.  This is not a debatable issue. … [W]hat I'm explaining here is that, independent of disputes about the meaning of this particular phrase, in the wide world outside of this room, automatic control is in fact almost always accomplished by manipulating

things other than the variable to be controlled.

F.Dep. JA 382:9-387:8.  The expert witness also described Note 7(a) as a "pretty good" description of automatic control because,

> the essence … [of] the complete control system is doing all the functions of accepting a desired value, measuring the value, performing the computation, and effecting actions that bring the desired value to where you want it … It [the subject merchandise] is an actuator, but these actuators … actively manage the position of the [valve or damper] shaft to hold it, to get it to and hold it to the desired value [position]."

F.Dep. JA 372:9-14, 21-24, 341:3-342:5.

While we recognize that statutory interpretation is within the province of the court, we submit that Plaintiff's witness was able to provide guidance to the court with respect to the interpretation of Note 7(a) that was consistent with the legislative history of this provision, and the scientific authorities that we believe to be embodied in the Note.  The CIT committed reversible error when it came to a conclusion that was contrary to both.

## 2.  External Measurement of Flow is Not a Statutory Requirement

The CIT concludes that Note 7(a) requires flow measurement to be *external* to the control instrument itself and that -

> [A]t no point do the subject imports measure the variable (i.e., the temperature, flow, pressure or otherwise) sought to be controlled and make adjustments as a result of comparing such *external measurements* to the desired temperature, flow, pressure, or otherwise.

40

JA 18, italics added.[16]  However, Note 7(a) does not describe the nature of the measurement to be performed by an automatic controller except to state that it measures the "actual value" of the factor to be automatically controlled.  The subject merchandise performs an indirect measurement of flow, as explained above, based on the mathematical relationship between motor winding (valve plug or damper blade) position and maximum flow within the pipe or duct.

However, even if this Court should agree with the CIT that "external" measurement of the variable to be controlled (flow) is required for instruments classifiable in heading 9032, the subject merchandise meets that standard.  The undeniable fact is that the valve plug or damper blade is *immersed in the variable to be controlled*, and that the *only* purpose of measuring motor winding rotation is to measure valve plug or damper blade position, which is *external* to the subject merchandise.  In this sense, the measurement performed by the subject merchandise is no different than exemplars set forth in EN 9032(I).

---

[16] The "desired" flow is signaled by the HVAC controller in terms of electric motor pulse counts, not an "external:" or "direct" *quantitative* measurement of the "actual value" of flow.  Thus, an "external" quantitative measurement of flow could not be "compared" with the "desired" flow signal, as the court suggests.  Plaintiff-appellee had argued before the CIT that the subject merchandise failed to satisfy Note 7(a)'s requirement that the instrument measurement be "directly" related to the "actual value" of the controlled variable.  The court's decision on this point does not stray far from plaintiff-appellee's arguments to the court.

41

EN 9032(I) explains that humidity may be measured or detected by reference to the length of strands of hair in a humidity regulator (exemplar (C)), and temperature may be measured or detected by reference to the shape of the bi-metal strip in a thermostat (exemplar (D)).  In terms of immersion in the variable to be controlled, all of these measurements are external to the automatic controller.  By calculation and interpretation, the position of the valve plug or damper blade in its operating range indicates flow, just as the length of the hair strands indicates humidity and the shape of the bi-metal strip indicates temperature.

Automatic control of flow does not require that the measured flow be reported or recorded quantitatively for the user or operator.  For example, the EN 9032(I) description of the required "measuring device" specifically states that "a simple device which is sensitive to changes in the variable (metal or bi-metal rod) may be used instead of a measuring device," which means there is *no requirement that the measuring device provide a quantitative reading* of the measurement, such as the scale on a thermometer. [17]  A thermostat can operate

---

[17] Compare heading 9028, which covers classification of gas or liquid meters that measure and quantify as a reported volume the amount of flow passing a certain point of measurement in a pipe.  EN 9028 explains that they "consist essentially of the measuring device (turbine, piston, diaphragm, etc.), the mechanism for regulating the admission of fluid (generally slide valves), the transmission (endless screw, camshaft gears or other systems), and the recorder

without a thermometer.  Nonetheless, a thermostat measures the "actual value" of temperature indirectly based on the shape of the bi-metal strip.  F.Dep. JA 421:23-422:13.

The subject merchandise senses changes in the variable to be controlled by means of the relationship between motor winding rotation, gears, and valve plug or damper blade position.  Although actual flow as a quantitative value has been calculated in the design of the HVAC system for each valve plug or damper blade position, a quantitative flow measurement is not required for automatic control of flow under these circumstances.  Instead, the indirect position measurements performed by the subject merchandise do "relate directly" to the flow volume of the liquid or gas through the valve or damper because of the mathematical relationship between valve plug or damper blade position and flow.  Flow is measured and controlled through these indirect measurements.

### 3. The Court Erred in Describing the ASIC as a "Sophisticated Switch"

In describing an HVAC system that incorporates the subject merchandise, the court stated that "the central controller sends the position signal to the ASIC, which serves as a sophisticated version of the switch in a traditional HVAC

---

*or an indicator* (pointer or drum type) or both."  The volumetric measurement and recording device is immersed in the flow to be measured.

system." JA 9. The only evidence the court cites for this conclusion is the following deposition testimony of plaintiff's fact witness, Michael Martinelli, in which he describes how the subject merchandise works:

> … [T]he central controller looks at the temperature in this room, compares it to where it wants the temperature in this room to be, … sends a position command …. If zero to nine volts is the span of operation, zero volts being zero degrees, nine volts being 90 degrees, … the position signal or set point from the central controller … would be, "Go to eight volts," 80 degrees. So at that point … our ASIC … looks at the signal, translates it, and commands the motor to turn the damper to the new position. And while it's doing that … ASIC monitors and senses the motor turns. … translates those turns into a damper position and … then …commands the motor to stop turning. It stops at a position, maintains that position until a new command is given.

M.Dep. JA 29:25-30:23. In other words, Mr. Martinelli testifies that upon receiving a position signal from the central controller, the subject merchandise (1) translates the signal into a pulse count representing a position within the range of rotation of the valve plug or damper blade, (2) controls the motor to the specified new position, and (3) then maintains that position until it receives a different signal from the central controller. In order to perform these functions generally described by Mr. Martinelli, the subject merchandise must perform all of the functions of an automatic controller of flow that are described in Note 7 and EN 9032.

The *McGraw-Hill Dictionary of Engineering* (2nd edition) at 547 defines "switch" as "[ELEC] A manual or mechanically device for making, breaking, or changing the connections in an electric circuit.  Also known as electric switch." Clearly, an electric switch cannot measure, calculate, and automatically control. Acting independently, the subject merchandise – not the HVAC controller – calculates the motor rotation need to achieve the desired position, operates the motor to achieve that position, and thereafter maintains that position against disturbances.  This is what Mr. Fairfax describes as "the essence" of an automatic flow controller.  F.Dep. JA 372:9-14.

Although not mentioned in the CIT opinion, *all models* of the subject merchandise also incorporate <u>variable programmable run time</u>, which is the time it takes for the valve plug or damper blade to travel from measured to desired position, is programmable.  M.Dep. JA 113:13.  For example, 90 degrees can be programmed for 90 seconds run time (1 degree per second) or 150 seconds (1.67 degrees per second).  F.Dep. JA  530.  Variable, programmable run time is used not to protect the motor but to achieve faster or slower change in the flow.  The ASIC calculates variable run time by taking into account motor winding revolutions per minute ("RPM"), gearbox ratio, *and* the operating range of the valve plug or damper blade.  *Id.*   Variable programmable run time is not a function of an electric switch.

45

E.   **THE CIT ERRED IN CLASSIFYING THE SUBJECT MERCHANDISE UNDER HTSUS HEADING 8501 AS AN ELECTRIC MOTOR**

   1. **HTSUS Section XVI Note 1(m) Excludes the Subject Merchandise from Heading 8501 because it is Classifiable under Heading 9032**

The CIT incorrectly affirmed defendant-appellee's classification of the subject merchandise as "electric motors" under HTSUS heading 8501.   The court's rationale was that heading 8501 was an eo *nomine* provision that covered all forms of motors, and that the subject merchandise was a motor with an ASIC. Specifically, the CIT stated that –

> relevant chapter and section Notes reinforce that an import remains classifiable as an electric motor even when it includes additional functionalities, like those that the ASIC provides to the electric motor in the subject imports, so long as the principal function remains the same … The ASIC does not change the principal function of the subject imports as electric motors.

JA 20-21.

The *ipse dixit* of the CIT does not conform to the facts or law in this case. First, as explained above, the ASIC does not impart an additional function to the electric motor.  Instead, it is integrated into the subject merchandise with the motor in order to create a single apparatus with one purpose and function: *automatic* control of flow.  Second, the section and chapter notes pertaining *specifically* to heading 8501 do not address the concept of "principal function," The additional parts and components of electric motors identified in EN 8501 do

46

not give the electric motor any additional functions. EN 8501 states that the sole function of an electric motor is "transforming electrical energy into mechanical power" and that motors remain classifiable in heading 8501 even if equipped with parts or accessories that impart to the motor the means of transferring the mechanical energy to a device connected after importation.[18]

The court lost sight of the fact that motors are basic products which merely convert electrical energy into mechanical energy. In our case, the incorporation of the programmed ASIC microprocessor into the subject

---

[18] EN 8501(I)(A) states, "[m]otors remain classified here even when they are equipped with pulleys, with gears or gear boxes, or with a flexible shaft for operating hand tools." These components are all mechanical extensions of the motor to enable it to turn the appliances to which they are connected. They are not elements that enable an imported product (including a motor) to automatically or independently monitor and control the appliances to which they are connected.

EN 8501(I) also states that rotary or linear electric motors include,

(1) **Servomotors**, presented separately, consisting essentially of an electric motor with speed-reducing gears and equipped with a power transmission device (e.g., lever, pulleys) designed to adjust the variable position of a regulating control in a furnace or in other plant (and possibly provided with an emergency hand wheel). …

(3) **Valve actuators, electrical**, consisting of an electric motor with reducing gear and drive shaft and, in some cases, with various devices (electric starter, transformer, hand-wheel, etc.) to operate the valve plug.

Bolded in original. Once again, there is nothing in EN 8501 that relates to automatic control of the appliance to which the motor is connected. The outboard motor example that the court mentions in its decision (JA 19) is inapposite to the subject merchandise, because an outboard motor is not programmed for *automatic* control of an appliance. It is controlled manually by the human operator of the outboard motor.

merchandise changes its functionality from electric motor to automatic controller of fluids and gases. The ASIC functions incorporated in this product relate not to motor control but to automatic control of other variables in the HVAC system. The motor is simply the "operating device" that implements the "decisions" of the programmed ASIC. F.Dep. JA 436:2-442:6.

Note 1(m) to Section XVI, HTSUS, excludes merchandise from heading 8501 that is classifiable under heading 9032. The Note embodies the basic tariff principal that products are to be classified in the provision which is most difficult to satisfy. See, e.g., *Orlando Food Corp. v. United States*, 140 F. 3d 1437, 1441 (Fed. Cir. 1998). The tariff provision for automatic controllers, which covers products that often include motors, is more difficult to satisfy than the provision for motors. Note 1(m) confirms that not all products that include motors are to be classified as motors. If all products that include motors were to be classified under heading 8501, then the scope of this tariff provision would be expanded beyond comprehension.

As explained above, Heading 9032, as interpreted by chapter 90 Note 7(a) and EN 9032(I) fully describe the sole function of the subject merchandise and identify its essential components.[19] The heading, Note, and relevant EN all

---

[19]Because heading 9032 fully describes the subject merchandise, there is also no occasion to engage in a "principal function" analysis under HTSUS Section XVI Note 3. Note 3, which Note 4 of chapter 90 incorporates into chapter 90,

identify the item as an "instrument or apparatus for automatically controlling liquids or gases or temperature." EN 9032(I) states in relevant part that –

> Apparatus for automatically controlling liquids or gases or temperature, within the meaning of Note 7(a) to this Chapter, consists of three devices forming *a single entity* …[20]

Italics added. There can be no doubt that the devices incorporated within the subject merchandise which measure, control, and start/stop/operate the valve plug or damper blade all work together as a "single entity" to control the flow of liquids and gases.

**2. The Court Misapplied the Federal Circuit Decision in *Nidec Corp. v. United States* in Holding that the Subject Merchandise was Classifiable under HTSUS Heading 8501**

The CIT incorrectly relied on *Nidec Corp. v. United States*, 68 F. 3d 1333, 1336-37 (Fed. Cir. 1995),[21] to support its conclusion that the subject merchandise is classifiable under heading 8501. JA 19.

---

provides in relevant part that "composite machines …designed for the purpose of performing two or more complementary … functions are to be classified as if consisting only of that … machine which performs the principle function."

[20] EN 9032(I) provides alternatively that the apparatus consisting of three devices may be classifiable "in accordance with Note 3 to this Chapter, a functional unit." Note 3 is inapplicable in this case because the subject merchandise is a *single entity*, "an integrated group of … devices used for *a particular purpose*," in this case *automatic control of flow*. *See* above page 21. The "functional unit" of chapter 90 Note 3 is described in Section XVI Note 3 as "*two or more machines fitted* together to form a whole and other machines designed for the purpose of performing *two or more complementary or alternative functions*." That does not describe the automatic flow controller which is the subject merchandise.

In *Nidec* plaintiff claimed that the imports were classifiable under HTSUS heading 8473 as parts and accessories of the machines of heading 8471 (automatic data processing machines) because they were custom-designed for assembly after importation into computer hard drives. The CIT classified the Nidec imports as electric motors under heading 8501, and the Federal Circuit affirmed.

The *Nidec* decisions are not relevant here because the merchandise at issue in that case was different in physical characteristics and function than the subject merchandise. In *Nidec* the merchandise at issue was an actuator assembly consisting of "a shaft centering a precision spindle, a stator and a rotor." that was designed for assembly into computer hard drives. *Nidec Corp. v. United States*, 861 F. Supp. 136 (CIT 1994). Significantly, the imports did *not* contain "the printed circuit assembly, which, among other things, contains the drive and commutation electronics for the motor." *Id*. at 139. The CIT described the interaction of the actuator assembly and the printed circuit assembly as follows:

> [T]he spindle's remarkable, precise rotation is engendered by the interaction of the rotor and the stator upon electrification. The rotors at issue are permanent magnets bonded into steel stamped rotor cups

---

[21] The CIT also cited *Nat'l. Advanced Sys. v. United States*, 26 F. 3d 1107, 111 (Fed. Cir. 1994), a case decided under the Tariff Schedules of the United States ("TSUS") that is discussed in the Federal Circuit opinion in *Nidec*, 68 F.3d 1333, 1337-1338. JA19.

> and surrounded by plastic rings bearing curved blades, which fan to equalize temperatures within the drive.  The stators are possessed of electromagnetic poles, a colored circuit disk which contains "hall cells", and lead wires for connection to the drive circuitry.  As explained by the plaintiff, "electrical current energizes the wound laminates, which then react with the magnetic poles of the rotor.' … The *hall cells* 'sense the position of the rotor's magnet, and *relay* this *positional information to the drive electronics found on the disc drives' [printed circuit assembly].' … The circuitry interprets 'the relative position of [the] magnet in the rotor and the stator poles, and then … chooses which is the optimum phase to apply direct current.'*

*Id.* at 825, record citation omitted, brackets in original; italics added.

It is clear from this explanation that the automatic control functions of this product were located in the printed circuit assembly, *not* in the imported actuator assembly.  Thus, the actuator assembly in *Nidec* is analogous to what plaintiff-appellant Belimo refers to as a "standard" actuator or a "smart motor."  F.Dep. JA 447:12-448:14.  It had no automatic control functions.

   This Court correctly affirmed the CIT decision in *Nidec* based on its finding that "[t]he basic character of Nidec's product as an electric motor is not changed because it is custom designed and made for a particular computer company or because it includes the precision spindle."  *Nidec*, 68 F. 3d 1333, 1337.

   This case is as different from *Nidec* as night from day.  In light of the physical characteristics and functions of the ASIC in the subject merchandise, which the court acknowledged, there is no basis for the CIT to conclude that the

51

subject goods should be classified as motors. The subject merchandise does not simply respond to a signal from an HVAC controller in order to position a valve or damper. It *measures* the current position of the valve or damper within its range of rotation, *calculates* any difference between desired and actual position, and *maintains* the desired position against disturbance *independently, without intervention* of a remote controller. That is the difference between an instrument or apparatus that simply performs a control function and one that *automatically* performs that control function.

In sum, the court's conclusion that the subject merchandise is to be classified as an electric motor expands HTSUS heading 8501 beyond comprehension. *See, e.g.,* the limited EN 8501 definition of "valve actuators, electrical," footnote 2 above. Functions performed by the ASIC in the subject merchandise transforms this product into an instrument or apparatus that is far removed from an electric motor in terms of physical characteristics and function. It can automatically monitor, control and adjust dampers and valves in an HVAC system to automatically control the flow of liquids and gas within the system in order to change and maintain the temperature in the buildings that are being serviced.

This is the first instance that we have identified where Customs and the CIT have found control electronics designed to maintain automatically against

disturbances the manual setting of an "appliance" to be an auxiliary and complementary feature of an electric motor. The ASIC is not designed to protect the motor from overwork or self-destruction. F.Dep. JA 528-533. The ASIC is not programmed to identify the position of the motor windings within range of rotation for any reason other than control of valve plug or damper blade position. Motor winding position is an indirect variable – a means to accomplish automatic control of the process variable, flow.

## CONCLUSION

For all of the reasons set forth above, plaintiff-appellant respectfully requests that this Court reverse the CIT decision that denied plaintiff-appellant's claim for reclassification and order the CIT to grant plaintiff-appellant's motion for summary judgment.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT, LLP

Attorneys for Plaintiff-Appellant,
399 Park Ave., 25th Floor
New York, NY 10022
Tel. (212) 557-4000

By: /s/ Robert F. Seely
    Robert B. Silverman
    Peter W. Klestadt

Dated: March 4, 2014

# ADDENDUM

Slip Op. 13- 144

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| BELIMO AUTOMATION A.G., | : |
| Plaintiff, | : |
| v. | : |
| UNITED STATES, | : |
| Defendant. | : |

*All parties agree this is a public document. See Docket #66.*

~~CONFIDENTIAL~~ **VERSION**

Before: Mark A. Barnett, Judge

Court No. 10-00113

**OPINION**

[The court finds that the subject imports were properly classified as "electric motors" under HTSUS 8501.10.40 and that they are not classified under HTSUS 9032.89.60. Accordingly, the court denies Plaintiff's motion for summary judgment and grants Defendant's cross motion for summary judgment.]

Dated: November 26 , 2013

Robert B. Silverman, Peter W. Klestadt, and Robert F. Seely, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP of New York, NY, for Plaintiff Belimo Automation A.G.

Stuart F. Delery, Assistant Attorney General, Civil Division, Department of Justice, Commercial Litigation Branch, New York, New York, for Defendant United States. With him on the brief were Barbara S. Williams, Attorney-in-Charge, and Amy M. Rubin, Acting Assistant Director. Of Counsel was Michael W. Heydrich, Office of Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, of New York, NY.

Barnett, Judge:  The case is before the court on cross-motions for summary judgment.

Belimo Automation A.G. ("Belimo") contests the denial of its protest in which U.S. Customs and

Border Protection ("Customs") classified the subject imports under subheading 8501.10.40 of the

Harmonized Tariff Schedule of the United States ("HTSUS") (2007) as electric motors. Belimo

contends in its motion for summary judgment that Customs should have classified the subject

imports under HTSUS 9032.89.60 as automatic regulating or controlling apparatuses because

each incorporates an application specific integrated circuit (ASIC). Defendant United States

asserts in its cross-motion that Customs correctly classified the subject imports under HTSUS

8501.

     No genuine issues of material fact exist regarding properties of the subject imports and

how they operate. Thus, the sole issue before the court is whether, as a matter of law, the subject

imports were properly classified under HTSUS 8501 as "electric motors" or whether they should

be classified under HTSUS 9032 as "automatic regulating and controlling instruments and

apparatus."[1]  For the reasons below, the court holds that Customs correctly classified the subject

imports as "electric motors" subject to HTSUS 8501 and, therefore, denies Belimo's motion for

summary judgment and grants Defendant's cross-motion for summary judgment.

## BACKGROUND AND PROCEDURAL HISTORY

### A. Overview of the Subject Imports

     The subject imports are principally used in HVAC systems, which heat and cool spaces

within buildings. (Def.'s Cross Mot. Summ. J. (hereinafter "Def.'s Cross Mot.") 2-3; Pl.'s

Statement of Material Facts Not in Issue (hereinafter "Pl.'s Statement of Facts") ¶¶ 12-13.) Each

consists of an electric motor, gears, and two printed circuit boards (PCBs), one of which is an

ASIC, within a plastic or metal housing unit.[2] (Def.'s Cross Mot. 2; Pl.'s Statement of Facts ¶

---

[1] If the court determines that neither proposed heading applies to the subject imports, the court must identify the appropriate heading. *EOS of N. Am., Inc. v. United States*, 37 CIT __, __, 911 F. Supp. 2d 1311, 1317 (2013) (quoting *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984)); *see also Latitudes Int'l Fragrance, Inc. v. United States*, 37 CIT __, __, 931 F. Supp. 2d 1247, 1252 (2013).

[2] Certain models of the subject imports also incorporate a spring mechanism. (Def.'s Cross Mot. 1 (accepting
(footnote continued)

9.) The ASIC connects to and monitors the electric motor. (Def.'s Cross Mot. 5-6; Pl.'s

Statement of Facts ¶¶ 31-32.) The motor, in turn, connects to and moves the gears. (Def.'s

Cross Mot. 7; Pl.'s Statement of Facts ¶ 27.) The gears link the subject imports to an external

mechanism that opens or closes a damper or a valve when the gears turn. (Def.'s Cross Mot. 1,

3, 7; Pl.'s Statement of Facts ¶¶ 26, 36, 41; Fairfax Dep. 30:14-25, June 5, 2012; Martinelli Dep.

83:17-22, 84:10-22, June 5, 2012.)

### B. Operation of an HVAC System

An HVAC system typically includes sensors that measure the ambient air temperature of

spaces in a building. (Def.'s Cross Mot. 3; Pl.'s Statement of Facts ¶ 15; Martinelli Dep. 24:15-

24:23.) A central controller[3] receives and processes signals from temperature sensors and

compares those signals to a pre-set, desired temperature for a given space. (Def.'s Cross Mot. 3;

Pl.'s Statement of Facts ¶¶ 14(a)-(f), 16; Fairfax Dep. 108:19-109:2; Martinelli Dep. 24:15-26:4,

29:23-30:5.) The central controller then signals to a motor[4] to reposition an attached valve to

change the amount of heated or cooled water that can flow through a water handling unit that

serves that space. (Def.'s Cross Mot. 1-3; Pl.'s Mot. Summ. J. (hereinafter "Pl.'s Mot.") 1-4;

Pl.'s Statement of Facts ¶¶ 16-17, 21-23, Fairfax Dep. 30:15-25, 62:18-63:17; Martinelli Dep.

20:4-23:21, 25:20-26:8, 40:3-18.) The temperature of the water in the water handling units

affects the air temperature within air handling units that also serve that space. (Def.'s Cross Mot.

---

Plaintiff's Statement of Facts unless otherwise noted); Pl.'s Statement of Facts ¶ 10.) This fact is not material to the
analysis. In addition, Belimo claims that the subject imports contain a hollow shaft connecting it to an external
damper or valve, while Defendant claims the hollow shaft is a gear. (Def.'s Cross Mot. 1; Pl.'s Statement of Facts
¶ 27 n.1.) This difference is also not material to resolution of this case.

[3] An HVAC system typically has multiple central controllers, usually one per floor. (*See* Def.'s Cross Mot. 1-3;
Pl.'s Statement of Facts ¶ 14(a)-(f); Fairfax Dep. 61:10-62:15; Martinelli Dep. 25:8-15; 94:18-95:9, 96:4-7.)
[4] A single central controller often controls multiple motors. (*See* Def.'s Cross Mot. 1-3; Pl.'s Statement of Facts
¶¶ 14(e)-(f), 16, 31-32; Fairfax Dep. 61:16-22; Martinelli Dep. 25:8-15; 94:18-95:9, 96:4-7.) In an HVAC system
that incorporates the subject imports, the subject imports take the place of the simple electric motors and receive the
central controller's signals. (Def.'s Cross Mot. 5; Pl.'s Statement of Facts ¶¶ 32, 39-40.)

1-3; Pl.'s Mot. 1-4; Pl.'s Statement of Facts ¶¶ 14b and c, 17-20; Martinelli Dep. 20:4-23:21,

25:20-27:7, 40:3-18.) Meanwhile, the central controller signals to a motor to reposition an

attached damper to change the amount of heated or cooled air that can flow through the ductwork

into the space that the air handling units serve. (Def.'s Cross Mot. 1-4; Pl.'s Mot. 1-4; Fairfax

Dep. 62:7-63:17; Martinelli Dep. 26:25-27:18, 29:23-30:23.)

### C. Operation of a Traditional HVAC System as Compared to One that Incorporates the Subject Imports

Compared to traditional HVAC systems, an HVAC system that incorporates the subject

imports can more precisely and consistently control the motor used to position dampers or

valves. (Def.'s Cross Mot. 4; Fairfax Dep. 30:14-25, 113:2-9.) In a traditional HVAC system,

the central controller conveys the position signal directly to the motor, which turns until it

triggers a switch that indicates the requested position has been reached. (Def.'s Cross Mot. 5;

Martinelli Dep. 32:2-8.) In a system incorporating the subject imports, the central controller

sends the position signal to the ASIC, which serves as a sophisticated version of the switch in the

traditional HVAC system. (Def.'s Cross Mot. 5; Pl.'s Statement of Facts ¶¶ 29-32; *see*

Martinelli Dep. 29:23-30:23.) The ASIC connects to and monitors the position of the motor.[5]

(Def.'s Cross Mot. 5-6; Pl.'s Statement of Facts ¶¶ 31-32; Pl's Mot. 9.) By monitoring the

motor's position, the ASIC can calculate the position of the gears in the subject merchandise,

which corresponds to the position of the attached valve or damper. (Def.'s Cross Mot. 7; Pl.'s

---

[5] Different models of the subject imports employ different methods to monitor the electric motor. (Def.'s Cross Mot. 1 (accepting statements of fact on pages 8-15 of Belimo's motion for summary judgment unless otherwise noted); Pl.'s Mot. 9; Fairfax Dep. 45:7-46:10; 58:18-60:9; 86:13-87:22; 101:6-115:15.) The ASIC in most models detects "back electromotive force," which enables it to count the motor's electrical signals. Other models of the subject merchandise use a potentiometer, a position sensor located outside the ASIC that measures electrical resistance as a function of motor rotation and sends that measurement to the ASIC. Other models incorporate a "Hall Sensor" that monitors the motor's magnetic field. (Def.'s Cross Mot. 1; Pl.'s Mot. 8-9.) In all models, the ASIC translates a measurement of the motor into the "percent opening" of the attached damper or valve. (Def.'s Cross Mot. 1; Pl.'s Mot. 8-9, n.12.) The differences in the subject imports' motor monitoring methods are not material to the court's analysis.

Case: 14-1165 CaSEASE-PARTICIPANTS:ON23 DoRageer05 22 FilePage 09/65/2014ed: 03/04/2014

Statement of Facts ¶¶ 37-38; Martinelli Dep. 29:15-23; Martinelli Affirm ¶¶ 7-8, July 9, 2012
(correcting statements in deposition testimony).) The ASIC compares the calculated gear
position with the desired position that it received from the central controller. (Def.'s Cross Mot.
5-6; Pl.'s Statement of Facts ¶ 39; Martinelli Dep. 62:11-63:10; Martinelli Affirm ¶¶ 7-8.) It
then calculates the motor operation required to rotate the gears so that the damper or valve will
move to the desired position. (Def.'s Cross Mot. 7; Pl.'s Statement of Facts ¶¶ 39-40.) The
ASIC then activates the motor, thereby turning the gears in the subject imports and repositioning
the damper or valve until it reaches the desired position. (Def.'s Cross Mot. 5-7; Pl.'s Statement
of Facts ¶¶ 32-33, 38-40; *see* Martinelli Dep. 30:6-30:14.)

### D. The ASIC's Independent Control Functions

The ASIC also performs certain functions independently. For example, it monitors the
subject imports' motor periodically and continuously, even absent a signal from the central
controller. (Def.'s Cross Mot. 5-6; Pl.'s Statement of Facts ¶¶ 37, 42; Martinelli Dep. 51:6-19;
Martinelli Affirm ¶¶ 5, 7, 10.) Using the inputs from this monitoring, the ASIC can
independently prevent and reverse unintended movement from the desired position. (Def.'s
Cross Mot. 5-7; Pl.'s Statement of Facts ¶¶ 42, 45.) Additional examples of the ASIC's
independent functions include its ability to adapt to receive an AC or DC signal from the
controller, filter out unintended electric signals, and use stored energy to prevent the motor from
spinning out of control when the power fails. (Def.'s Cross Mot. 1 (accepting statements of fact
in Pl.'s Mot. 8-15 unless otherwise noted); Pl.'s Mot. 12-15.)

### E. The Subject Imports Do Not Measure or Calculate External Variables

Despite these independent control functions, the subject imports can only monitor the
position of the motor and calculate the position of the incorporated gears. (Def.'s Cross Mot. 7;

Pl.'s Statement of Facts ¶¶ 31-32, 36-39; Fairfax Dep. 67:2-8, 93:12-25.) The subject imports do

not incorporate a temperature sensor, measure temperature or any variable of airflow or of a

liquid, or compare such an external measurement to a predetermined value. (Def.'s Cross Mot.

7; Fairfax Dep. 51:6-14, 55:11-56:4; Martinelli Dep. 52:20-53:13, 77:21-78:3.) Instead, the

subject imports position their incorporated motor and gears in response to a signal received from

the central controller, thereby affecting the position of an attached damper or valve. (Def.'s

Cross Mot. 13; Martinelli Dep. 84:10-22, 86:4-87:22.)

### F. Procedural History

The subject imports entered the United States between February 9, 2007 and February 26,

2007. Customs liquidated them between December 21, 2007 and January 11, 2008 under

HTSUS 8501. Belimo timely filed a protest of this classification decision on June 17, 2008. On

September 18, 2009, Customs confirmed that the subject imports fall under HTSUS 8501 as

electric motors. HQ H044560 (Sept. 18, 2009). Belimo now challenges the denial of its protest.

The parties have fully briefed the issues, and the court now rules on their respective motions for

summary judgment.

## JURISDICTION AND STANDARD OF REVIEW

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1581(a).

The court may grant summary judgment when "there is no genuine issue as to any material fact."

USCIT R. 56(c). Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." USCIT R. 56(a); *see, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48

(1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987).

The court's review of a classification decision involves two steps. First, it must determine the meaning of the relevant tariff provisions, which is a question of law. *See Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365-66 (Fed. Cir. 1998). Second, it must determine whether the merchandise at issue falls within a particular tariff provision as construed, which is a question of fact. *Id.* When no factual dispute exists regarding the import, resolution of the classification turns solely on the first step. *See id.*; *see also Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1378 (Fed. Cir. 1999).

While the court accords deference to Customs classification rulings relative to their "power to persuade," *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)), the court has "an independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS terms." *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005) (citing *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1358 (Fed. Cir. 2001)).

## DISCUSSION

The General Rules of Interpretation ("GRIs") provide the analytical framework for the court's classification of goods. *See N. Am. Processing Co. v. United States*, 236 F.3d 695, 698 (Fed. Cir. 2001). "The HTSUS is designed so that most classification questions can be answered by GRI 1 . . . ." *Telebrands Corp. v. United States*, 36 CIT __, __, 865 F. Supp. 2d 1277, 1280 (2012). GRI 1 states that "for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes." HTSUS, GRI 1. The court must consider chapter and section notes of the HTSUS in resolving classification disputes because they are statutory law, not interpretive rules. *See Libas, Ltd. v. United States*, 193 F.3d 1361, 1364 (Fed. Cir. 1999).

"Absent contrary legislative intent, HTSUS terms are to be 'construed (according) to their common and popular meaning.'" *Baxter Healthcare Corp. v. United States*, 182 F.3d 1333, 1337 (Fed. Cir. 1999). "Courts may rely upon their own understanding of terms and/or consult dictionaries, encyclopedias, scientific authorities, and other reliable information." *Brookside Veneers, Ltd. v. United States*, 847 F.2d 786, 789 (Fed. Cir. 1988); *BASF Corp. v. United States*, 35 CIT __, __, 798 F. Supp. 2d 1353, 1357 (2011). For additional guidance on the scope and meaning of tariff headings and notes, the court also may consider the Explanatory Notes ("ENs") to the Harmonized Commodity Description and Coding System, developed by the World Customs Organization. *Lynteq, Inc. v. United States*, 976 F.2d 693, 699 (Fed. Cir. 1992). Although ENs do not bind the court's analysis, they are "indicative of proper interpretation" of the tariff schedule. *Id.* (quoting H.R. Rep. No. 100-576, at 549 (1988) (Conf. Rep.), *reprinted in*, 1988 U.S.C.C.A.N. 1547, 1582) (internal quotation marks omitted); *see also E.T. Horn Co. v. United States*, 367 F.3d 1326, 1329 (Fed. Cir. 2004) (citing *Len-Ron Mfg. Co. v. United States*, 334 F.3d 1304, 1309 (Fed. Cir. 2003)).

### A. Competing Tariff Headings

Customs determined that the subject imports fall under HTSUS 8501.10.40 while Belimo asserts that they fall under HTSUS 9032.89.60. These provisions state as follows:

**8501**    Electric motors and generators (excluding generating sets):
    8501.10    Motors of an output not exceeding 37.5 W:
            Of under 18.65 W:
        8501.10.40    Other

**9032**    Automatic regulating and controlling instruments and apparatus; parts and accessories thereof:
    9032.89    Other:
        9032.89.60    Other

Belimo alleges that the subject imports are not "simple motors" of the type covered by

HTSUS 8501. (Pl.'s Mot. 1.) Rather, Belimo argues that the subject imports should be

categorized under HTSUS 9032 because each incorporates an ASIC, which allows the subject

imports to automatically control air flow by controlling motor operation and thus the opening

and closing of attached dampers and valves. (Pl.'s Mot. 1.) Defendant responds that the subject

imports are classified under HTSUS 8501 because they are electric motors. (Def.'s Cross Mot.

11.) Defendant further argues that the ASIC does not remove the subject imports from this

provision because HTSUS 8501 covers electric motors that incorporate additional components

and because the principal function of the subject imports is to serve as electric motors. (Def.'s

Cross Mot. 11.)

### B. HTSUS 9032.89.60

HTSUS 9032 covers "(a)utomatic regulating and controlling instruments and apparatus."

According to Chapter 90 Note 7(a), Heading 9032 applies to:

> Instruments and apparatus for automatically controlling the flow, level, pressure or other
> variables of liquids or gases, or for automatically controlling temperature, whether or not
> their operation depends on an electrical phenomenon which varies according to the factor
> to be automatically controlled, which are designed to bring this factor to, and maintain it
> at, a desired value, stabilized against disturbances, by constantly or periodically measuring
> actual value . . . .

Belimo interprets this Note as requiring an apparatus to control two distinct things, a

"variable" of liquids, gases, or temperature, and a "factor" that impacts that variable. Belimo

argues that the "factor" cannot refer to flow, temperature, or another variable of liquid or gas

because a variable of liquid or gas cannot vary in direct relation to an electrical phenomena, as

the Note requires. (Pl.'s Mot. 21-22.) In contrast, the subject imports can automatically control

the position of an attached damper or valve through an "electrical phenomenon," which it

identifies as the operation of the electric motor and the corresponding rotation of the gears. (Pl.'s

Mot. 22.) Belimo further urges that the definition of "factor" is "a fact or situation that

influences a result," not the result itself.[6] (Pl.'s Mot. 22 (citing Cambridge Dictionary, *available*

*at* www.dictionary.cambridge.org/dictionary/american-english (last visited Oct. 30, 2013).) It

reasons that the subject imports' control over the position of a damper or valve influences the

flow of liquid or gas, thereby satisfying the terms of the Note. Thus, under Belimo's

interpretation, the subject imports satisfy the Note's terms by automatically controlling air flow

(the "variable") through their automatic control of an attached damper or valve (the "factor").

(Pl.'s Mot. 21-22.)

        Defendant responds that "the factor to be automatically controlled" is simply shorthand

for "flow, level, pressure or other variables of liquids or gases, or . . . temperature." (Def.'s

Cross Mot. 18-19.) Because "factor" and "variable" refer to the same thing, Defendant contends

that the subject imports cannot satisfy HTSUS 9032 because they do not automatically control a

variable of liquids, gases, or temperature. (Def.'s Cross Mot. 18-19.)

        The plain language of the Note conforms to Defendant's interpretation – that the terms

"variable" and "factor" are synonymous. The word "factor" is modified by a definite article,

which indicates that "factor" refers to something identified earlier in the passage. *Warner-*

*Lambert*, 316 F.3d at 1356 ("[I]t is a rule of law well established that the definite article 'the'

particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite

or generalizing force of 'a' or 'an.'") (internal quotation marks omitted); Merriam-Webster

Dictionary, *available at* http://www.merriam-webster.com/dictionary (defining "the" as "used to

---

[6] Belimo also offers expert testimony that "factor" cannot be synonymous with "variable" in scientific usage. (*See, e.g.*, Fairfax Dep. 70:15-71:22, 73:13-20; 77:15-20.) However, the definitions of "factor" and "variable" in the context of this Note speak to statutory interpretation, which is a question of law for the court, and the court is not persuaded by the expert's technical view of this statutory language. *Goldhofer Trailers USA, Inc. v. United States*, 7 CIT 141, 142 (1984) (citing *Am. Express Co. v. United States*, 39 C.C.P.A. 8, 10 (1951)); *EOS*, 37 CIT at __, 911 F. Supp. 2d at 1322.

indicate a person or thing that has already been mentioned or seen or is clearly understood from the situation"). In this case, the only syntactically plausible antecedent for "factor" is "variable."

Further, identical language modifies the two terms. The instrument is "for automatically controlling the . . . variables," and the "factor" is "automatically controlled." The language surrounding the terms thus suggests that the drafters intended "factor" to be shorthand for the previously specified variables. Indeed, the definitions of "variable" and "factor" overlap. The American Heritage Science Dictionary defines "variable" as a "*factor* or condition that is subject to change." American Heritage Science Dictionary, The American Heritage® Science Dictionary (2010), *available at* http://science.yourdictionary.com (last visited Oct. 30, 2013) (emphasis added). Similarly, a non-science dictionary defines "variable" as "something that may or does vary; a variable feature or *factor*." Dictionary.com, *available at* http://dictionary.com (last visited Oct. 30, 2013) (emphasis added). While Belimo offers definitions in which "factor" does not define "variable," the range of definitions demonstrates that the terms may be used synonymously or, as in this case, one may be used as a shorthand for the other, when that other is extensively modified. Thus, the court finds that "factor," as used in Chapter 90, Note 7(a), necessarily refers to a variable of liquid, gas, or temperature, not to damper or valve position, as Belimo contends.

The cases that Belimo cites do not support its interpretation of Note 7(a). Neither case discusses the definitions of "variable" or "factor." In *Applied Biosystems v. United States*, the court evaluated whether HTSUS 9032 fully described a product that combined equipment that heated and cooled, a sensor for measuring temperature, and a controller that directed heating and cooling. 34 CIT __, __, 715 F. Supp. 2d 1327, 1330 (2010). The court concluded that HTSUS 9032 does not cover the equipment that heated and cooled. *Id.* at __, 715 F. Supp. 2d at 1334-36.

Likewise, in *Whirlpool Corp. v. United States*, the court considered whether the presence of a

defrost timer removed a refrigerator subassembly that also included a thermometer from HTSUS

9032. 31 C.I.T. 1147, 1150-51 (2007). The court never discussed whether there is a distinction

between a "variable" and a "factor." *See generally id.* It simply concluded that the subassembly

automatically regulated temperature because it included a thermometer to measure temperature

and a defrost timer that powered a heater when a compressor had run for a predetermined time.

*Id.* at 1151-53.

The EN accompanying HTSUS 9032 reinforces the conclusion that the subject imports

do not fall under HTSUS 9032 because they do not measure any variable of air flow, a liquid, or

temperature. EN 9032(1) states that a product falling under HTSUS 9032 should consist of:

> (a) A device for measuring the variable to be controlled (pressure or level in a tank, temperature in a room, etc.); in some cases, a simple device which is sensitive to changes in the variable (metal or bi-metal rod) may be used instead of a measuring device.
>
> (b) A control device which compares the measured value with the desired value and actuates the device in (c) below accordingly.
>
> (c) A starting, stopping or operating device.

Explanatory Note to 9032, HTSUS. Belimo argues that the subject imports satisfy all three

criteria. However, the subject imports do not include a device for measuring temperature or any

other variable of liquid or gas. (Def.'s Cross Mot. 7; Fairfax Dep. 51:6-14, 55:11-56:4;

Martinelli Dep. 77:21-25, 78:2-3.)

The error in Belimo's reasoning is most clear when considering EN 9032(1) subsection

(a) in conjunction with subsection (b), which requires an import to include a control device that

compares the measured value with the desired value. Together, the language of these

subsections indicates that a product meeting the criteria of HTSUS 9032 must measure the value

of the temperature or the flow, level, pressure, or other variable of a liquid or gas. Here,

however, the subject imports do not measure one of these variables. (Def.'s Cross Mot. 7;

Fairfax Dep. 51:6-14, 55:11-56:4; Martinelli Dep. 77:21-78:3.) Instead, they receive a signal

which they interpret to determine a setting for the damper or valve, control a motor to move the

damper or valve to that setting, and monitor the motor to ensure that the damper or valve remains

at that setting. (Def.'s Cross Mot. 4-7; Pl.'s Statement of Facts ¶¶ 29-33, 37-40, 42, 45; Pl's

Mot. 9; Fairfax Dep. 92:23-93:8, 113:2-9; Martinelli Dep. 29:15-30:23, 51:6-19, 62:11-63:10;

Martinelli Affirm ¶¶ 5, 7-8, 10.) While the internal monitoring of the motor position may ensure

more reliable positioning of the damper or valve being controlled by the subject imports, at no

point do the subject imports measure the variable (i.e., the temperature, flow, pressure or

otherwise) sought to be controlled and make adjustments as a result of comparing such external

measurements to the desired temperature, flow, pressure or otherwise. (Def.'s Cross Mot. 5-7,

13-14; Pl.'s Statement of Facts ¶¶ 37-39, 42; Martinelli Dep. 77:21-78:3; Fairfax Dep. 51:6-14,

55:11-56:4.)[7]

     Accordingly, the subject imports are not classifiable as "automatic regulating and

controlling instruments and apparatus" under HTSUS 9032.

---

[7] Because the subject imports fail to meet the criteria of EN 9032(1)(a) and (b), the court need not determine
whether they satisfy the requirement in EN 9032(1)(c) that they include a starting, stopping, or operating device.

Belimo also asserts that the subject imports are also known as HVAC "draft regulators" or "oven draught regulators"
when they are used to regulate or control the operation of a furnace or boiler by automatically measuring and
regulating the position of the moveable mechanism of a valve or damper that affects the flow of air or fluid (e.g.,
water or liquid fuel to the boiler) "by reference to the temperature, pressure, etc." (Pl.'s Statement of Facts ¶ 46;
Pl.'s Mot. 27-28 (citing EN 9032(1)(F).) The EN to HTSUS 9032 indicates that oven draft regulators are an
example of an automatic control instrument that satisfies Note 7(a) and thus fall under Heading 9032. Explanatory
Note to 9032, HTSUS ("This group includes . . . (F) Oven-draught regulators are used, for example, in central
heating or air conditioning plants to control automatically the air intake by reference to the temperature, pressure,
etc."). However, the subject imports do not meet the criteria for EN 9032(a) or (b) and do not qualify as "oven draft
regulators."

### C. HTSUS 8501.10.40

In contrast, the subject imports are properly classified under HTSUS 8501, covering "electric motors." According to the related EN, "electric motors" are "machines for transforming electrical energy into mechanical power."[8] Explanatory Note to 8501, HTSUS. Here, the subject imports receive an electronic signal from the central controller and use the mechanical power from the incorporated motor and gears to move an attached damper or valve. (Def.'s Cross Mot. 1, 3, 5-7; Pl.'s Statement of Facts ¶¶ 26-27, 29-33, 36, 38-41; Fairfax Dep. 30:14-25; Martinelli Dep. 29:23-30:14, 83:17-22, 84:10-22.) The subject imports thus satisfy the definition of an "electric motor" to be classified under Heading 8501.

The fact that the subject imports incorporate an ASIC does not remove them from the provision. Heading 8501 is an *eo nomine* provision, meaning that it includes "all forms" of "electric motors," even those equipped with additional components, absent limiting language or contrary legislative intent. *Nidec Corp. v. United States*, 68 F.3d 1333, 1336-37 (Fed. Cir. 1995); *see also Nat'l Advanced Sys. v. United States*, 26 F.3d 1107, 1111 (Fed. Cir. 1994). As discussed below, an electric motor remains classifiable under HTSUS 8501 even if it incorporates additional parts and components. For example, an EN to Heading 8501 indicates that "(m)otors remain classified here even where they are equipped with pulleys, with gear boxes, or with a flexible shaft for operating hand tools" and specifically mentions that the heading encompasses "'outboard motors,' for the propulsion of boats, in the form of a unit comprising an electric motor, shaft, propeller and a rudder." Explanatory Note to 8501, HTSUS.

---

[8] The parties agree that the subject imports would be classified as electric motors under HTSUS 8501 if each did not include an ASIC (Def.'s Cross Mot. 26; *see* Pl.'s Mot. 29-31 (stating that ASIC removes subject imports from HTSUS 8501 covering electric motors); *see also* Belimo's Legal Basis of Protest and Application for Further Review, Martinelli Dep. Ex. C at 16 (conceding that "without the ASIC electronics [the subject imports] likely would be classifiable as electric motors under HTSUS heading 8501").)

The relevant chapter and section Notes reinforce that an import remains classifiable as an electric motor even when it includes additional functionalities, like those that the ASIC provides to the electric motor in the subject imports, so long as the principal function remains the same. Note 3 to Section XVI, which encompasses Heading 8501, states that "[u]nless the context otherwise requires . . . machines designed for the purpose of performing two or more complementary or alternative functions are to be classified as . . . that machine which performs the *principal function*." Note 3, Section XVI HTSUS (emphasis added); *see also* Explanatory Note to Section XVI, Part (VI) Multi-Function Machines and Composite Machines, HTSUS ("Composite machines consisting of two or more machines or appliances of different kinds, fitted together to form a whole, consecutively or simultaneously performing separate functions, which are generally complimentary and are described in different headings of Section XVI, are also classified according to the *principal function* of the composite machine . . . .") (emphasis added).

The subject imports include two types of machines: an electric motor and two printed circuit boards, including the ASIC.[9]  Certainly, the ASIC contributes additional functionalities beyond those that a basic electric motor offers, including continuous monitoring of the motor absent a signal from the central controller, adapting to AC or DC electrical signals, and storing energy for use in the event of a power failure. (Def.'s Cross Mot. 1, 4, 7, 32; Pl.'s Statement of Facts ¶¶ 11, 29, 37-40, 42, 45; Pl.'s Mot. 8-15.)  However, these functions are complementary to

_____

[9] A "machine" includes "any machine, machinery, plant, equipment, apparatus or appliance cited in the headings of Chapter 84 or 85." Note 5 to Section XVI, HTSUS. On its own, the electric motor in the subject imports would likely be classified under HTSUS 8501. (Def.'s Cross Mot. 26; *see* Pl.'s Mot. 29-31 (stating that ASIC removes subject imports from HTSUS 8501 covering electric motors); *see also* Belimo's Legal Basis of Protest and Application for Further Review, Martinelli Dep. Ex. C at 16 (conceding that "without the ASIC electronics [the subject imports] likely would be classifiable as electric motors under HTSUS heading 8501"); Fairfax Dep. 111:17-113:9.) If imported separately, the printed circuit boards would likely fall under HTSUS 8537 covering "boards and panels . . . equipped with two or more apparatus of heading 8535 or 8536, for electric control or the distribution of electricity." (Def.'s Cross Mot. 30; Pollichino Decl. ¶ 8, Apr. 18, 2013 (citing Chapter 85, HTSUS 8537).)

the functions of the electric motor such that, even with the ASIC, the subject imports serve the same principal function of using mechanical power to position an attached damper or valve as a traditional electric motor would in an HVAC system. (Def.'s Cross Mot. 4-5; Pl.'s Statement of Facts ¶¶ 12, 23, 25, 28, 31-33; Martinelli Dep. 29:10-15, 37:20-38:9; Fairfax Dep. 47:4-16.) The additional functionalities that the ASIC provides all relate to improving the precision and reliability of the motor's operation so that the motor can better do its job of positioning the attached dampers and valves in accordance with the signal received from the central controller. Thus, the ASIC does not change the principal function of the subject imports as electric motors. *See Nidec*, 68 F.3d at 1337 (affirming that import remained classifiable as electric motor even though it incorporated a "precision spindle and other components" because "(t)he basic character of (the) product as an electric motor is not changed because it is custom designed . . . or because it includes the precision spindle") (internal citations omitted). Customs therefore correctly classified the subject imports under HTSUS 8501 based on their principal function as electric motors.

## CONCLUSION

For the reasons stated above, the subject imports are properly classified in subheading 8501.10.40 HTSUS, subject to duty at 4.4 percent *ad valorem*. The court thus denies Plaintiff's motion for summary judgment and grants Defendant's cross motion for summary judgment. Judgment will be entered accordingly.

/s/ Mark A. Barnett
Judge

Dated: November 26 , 2013
New York, New York



Case 1:10-cv-00113-MAB   Document 62-2 *SEALED*   Filed 11/26/13   Page 1 of 3

Dictionary   Thesaurus   Word Dynamo   Quotes   Reference   Translator   Spanish        Log In   Sign Up   Premium

variable

**Related Searches**

Independent variable
Manipulated variable
Dependent variable
Science variables
Controlled variable
Responding variable
Continuous variable
Quantitative variable

**Nearby Words**

varia
varia lectio
variability
variable
variable annuity
variable contrast pa...
variable cost

**Synonyms**

temperamental
vacillating
capricious
uncertain
unsettled
mercurial
irregular
MORE

# variable

Use Variable in a sentence

Variable Definition                    Ads
reference.addonreviews.com/
What Is Variable? Find Out w/the Reference Toolbar

Get The Dictionary.com Mobile App!
www.dictionary.com/mobile
Enjoy Exclusive Features like Voice Search! iPhone, Android, iPad, BlackBerry, Windows & More. Download Now!

**var·i·a·ble**   [vair-ee-*uh*-buh l]   Show IPA

*adjective*

1. apt or liable to *vary* or change; changeable: *variable weather; variable moods.*

2. capable of being *varied* or changed; alterable: *a variable time limit for completion of a book.*

3. Inconstant; fickle: *a variable lover.*

4. having much *variation* or diversity.

5. *Biology* . deviating from the usual type, as a species or a specific character.

**Relevant Questions**

*noun*

9. something that may or does vary; a variable feature or factor.

10. *Mathematics, Computers.*
    a. a quantity or function that may assume any given value or set of values.
    b. a symbol that represents this.

11. *Logic.* (in the functional calculus) a symbol for an unspecified member of a class of things or statements. Compare bound variable, free variable.

12. *Astronomy* , variable star.

13. *Meteorology* .
    a. a shifting wind, especially as distinguished from a trade wind.
    b. variables, doldrums ( def 2a ) .

*Origin:*
1350–1400; late Middle English < Latin *variābilis,* equivalent to *vari* ( *us* ) various + *-ābilis -able*

**Related forms**
var·i·a·bil·i·ty, var·i·a·ble·ness, *noun*
var·i·a·bly, *adverb*
hy·per·var·i·a·bil·i·ty, *noun*
hy·per·var·i·a·ble, *adjective*
hy·per·var·i·a·bly, *adverb*

**Can be confused:** 1. boundary, limit, parameter, variable (see synonym study at boundary)(see usage note at parameter) ; 2. variable, variant.

**Synonyms**
3. vacillating, wavering, fluctuating, unsteady, mercurial.

**Antonyms**
1, 3. constant.

Dictionary.com Unabridged
Based on the Random House Dictionary, © Random House, Inc. 2013.
Cite This Source | Link To variable

**Related Questions**

What is the definition of

World English Dictionary                              Collins

**Example sentences**

In addition, constantly changing loads and highly variable operating conditions

The curtain adds softness and variable degrees of privacy and connection.

They may be beginning to bolt with the variable weather we've been having.

Autism is probably many different, highly variable disorders caused by multiple

Remove ads like these. Upgrade now!

**Related Words**

| | |
|---|---|
| Independent variable | Cepheid variable |
| dependent variable | free variable |
| parameter | implicit differentiation |
| asymptotic | irregular variable |
| control variable | iterated integral |
| bound variable | polynomial |
| MORE | |

**Matching Quote**

"There is not so *variable* a thing in nature as a lady's head-dress."

-Joseph Addison
  MORE

Copyright © 2013 Dic ionary.com, LLC. All rights reserved.        About | PRIVACY POLICY | Terms | Careers | Advertise with Us | Contact Us | Suggest a Word | Help

Case: 14-1165 Case 4:14-PARTICIPANTS ONLY Document 22 Filed: 03/04/2014 Page 1 of 4
The - Definition and More from the Free Merriam-Webster Dictionary          Page 1 of 4
Case 1:10-cv-00113-MAB   Document 62-3 *SEALED*   Filed 11/26/13   Page 1 of 4



**BOLDER.**                    **SAVE $2**



Merriam-
Webster

m-w.com

Quizzes & Games | Word of the Day | Video | New Words | My Favorites

New!
**Spanish Central ▸**

the                    Subm





**?** **Quiz**
**Name That Thing**
Take Our 10-Question Quiz

**the**                    Save  Popularity
                          ☆      ⌒

45 ENTRIES FOUND:
  the
  The Colony
  The Hague

Save this word to your Favorites.        Sk☒
If you're logged into Facebook, you're ready to go.



**Why Words Get Cut from the Dictionary**

Sponsored Links
**Top Stock Pick FTTN**
Substantial Gains Likely with this Hot Play--Find Out More
www.FirstTitanEnergy.com

**ˈthe**   *definite article*  \before consonants usually
ṯẖ∂, before vowels usually ṯẖē, sometime before vowels
also ṯẖə; for emphasis before titles and names or to
suggest uniqueness often ṯẖē\

—used to indicate a person or thing that has already been
mentioned or seen or is clearly understood from the
situation

—used to refer to things or people that are common in daily
life

—used to refer to things that occur in nature

**Full Definition of THE**                    8+1   Like

1  **a** —used as a function word to indicate that a following noun
   or noun equivalent is definite or has been previously specified
   by context or by circumstance <put *the* cat out>

   **b** —used as a function word to indicate that a following noun
   or noun equivalent is a unique or a particular member of its
   class <*the* President> <*the* Lord>

   **c** —used as a function word before nouns that designate
   natural phenomena or points of the compass <*the* night is
   cold>

   **d** —used as a function word before a noun denoting time to
   indicate reference to what is present or immediate or is under
   consideration <in *the* future>

   **e** —used as a function word before names of some parts of
   the body or of the clothing as an equivalent of a possessive
   adjective <how's *the* arm today>

   **f** —used as a function word before the name of a branch of
   human endeavor or proficiency <*the* law>

   **g** —used as a function word in prepositional phrases to
   indicate that the noun in the phrase serves as a basis for
   computation <sold by *the* dozen>


**$50 OFF**


BELLINI•   www.befini.com

**MORE QUIZZES**


**Spell It**
The commonly misspelled words quiz
Hear It, Spell It »


**Vocabulary Quiz**
How strong is your vocabulary?
Take the Quiz »

**Q**
**Quizzitive: Our New App!**
The Vocab Quiz Game for iPhone & iPad
☆☆☆☆☆ "Incredibly fun and addictive.
And informative!" — User Review, iTunes
Download the App »


**"A Kiss is a Lovely Trick," &
More**
Favorite Quotations About Words, Vol. 1

**Don't Call Me a Loblolly, You
Blatherskite**
Rare and Amusing Insults, Vol. 2

◁ ● ○ ○ ▷

**PHOTO CONTEST: THE WINNERS**


**"Serendipity"**
You showed us hundreds of
ways to look at
"serendipity."
View the Top 15 »

Case 1:10-cv-00113-MAB    Document 62-3 *SEALED*    Filed 11/26/13    Page 2 of 4

**h** —used as a function word before a proper name (as of a ship or a well-known building) <*the* Mayflower>

**i** —used as a function word before a proper name to indicate the distinctive characteristics of a person or thing <*the* John Doe that we know wouldn't lie>

**j** —used as a function word before the plural form of a surname to indicate all the members of a family <*the* Johnsons>

**k** —used as a function word before the plural form of a numeral that is a multiple of ten to denote a particular decade of a century or of a person's life <life in *the* twenties>

**l** —used as a function word before the name of a commodity or any familiar appurtenance of daily life to indicate reference to the individual thing, part, or supply thought of as at hand <talked on *the* telephone>

**m** —used as a function word to designate one of a class as the best, most typical, best known, or most worth singling out <this is *the* life> <*the* pill> ; sometimes used before a personal name to denote the most prominent bearer of that name

**2 a** (1) —used as a function word with a noun modified by an adjective or by an attributive noun to limit the application of the modified noun to that specified by the adjective or by the attributive noun <*the* right answer> <Peter *the* Great> (2) —used as a function word before an absolute adjective or an ordinal number <nothing but *the* best> <due on *the* first>

**b** (1) —used as a function word before a noun to limit its application to that specified by a succeeding element in the sentence <*the* poet Wordsworth> <*the* days of our youth> <didn't have *the* time to write> (2) —used as a function word after a person's name to indicate a characteristic trait or notorious activity specified by the succeeding noun <Jack *the* Ripper>

**3 a** —used as a function word before a singular noun to indicate that the noun is to be understood generically <*the* dog is a domestic animal>

**b** —used as a function word before a singular substantivized adjective to indicate an abstract idea <an essay on *the* sublime>

**4** —used as a function word before a noun or a substantivized adjective to indicate reference to a group as a whole <*the* elite>

**Origin of THE**

Middle English, from Old English *thē*, masculine demonstrative pron. & definite article, alteration (influenced by oblique cases — as *thæs*, genitive — & neuter, *thæt*) of *sē*; akin to Greek *ho*, masculine demonstrative pron. & definite article — more at THAT

First Known Use: before 12th century

**Rhymes with THE**

b, be, bee, c, cay, cee, Cree, d, dee, Dee, dree, e, fee, flea, flee, free, g, gee, ghee, glee, gree, he, key, Key, knee, lea, lee, me, mi...
[+] more

²**the** *adverb*

**STAY CONNECTED**



**Get Our Free Apps**
Voice Search, Favorites, Word of the Day, and More
iPhone | iPad | Android | More



**Join Us on FB & Twitter**
Get the Word of the Day and More
Facebook | Twitter



*About Our Ads*



Case: 14-1165 CaSE-1165 ICIDANTSEON2Y DoRamee3 22 FileRage03/04/2014ed: 03/04/2014
The - Definition and More from the Free Merriam-Webster Dictionary                Page 3 of 4

Case 1:10-cv-00113-MAB   Document 62-3 *SEALED*   Filed 11/26/13   Page 3 of 4

**Definition of THE**

1 : than before : than otherwise —used before a comparative
<none *the* wiser for attending>

2 a : to what extent <*the* sooner the better>

   b : to that extent <the sooner *the* better>

3 : beyond all others <likes this *the* best>

**Origin of THE**

Middle English, from Old English *thy* by that, instrumental of
*thæt* that

First Known Use: before 12th century

²**the** *preposition*

**Definition of THE**

: PER 2 <a dollar *the* dozen>

**Origin of THE**

¹*the*

First Known Use: 15th century

**Learn More About THE**

⊕ Spanish Central Translation: "the" in Spanish

**Browse**

• Next Word in the Dictionary: the-
• Previous Word in the Dictionary: thdr
• All Words Near: the

❝ **Seen & Heard** ❞

What made you want to look up *the*? Please tell us where you
read or heard it (including the quote, if possible).

28

Case: 14-1165 Case: PARTICIPANTS ONLY Document: 22 Filed: 03/04/2014 Page 4 of 4
The - Definition and More from the Free Merriam-Webster Dictionary

Case 1:10-cv-00113-MAB   Document 62-3 *SEALED*   Filed 11/26/13   Page 4 of 4



**31 comments**

Add a comment...

Comment using....

**Erin Gabriel Soriano**

4

Reply · Like · November 8 at 6:40pm

**Erin Gabriel Soriano**

the that is so simple, but why is it so popular?

Reply · Like · November 8 at 6:40pm

**Mary Ann Etac**

me to,.i learn this now?

Reply · Like · October 17 at 11:12pm

**Marcia Merritt Hauenstein**    Top Commenter · Sarasota, Florida

In the first grade, while learning the vowels, we were taught to pronounce "the" as "thee" before a vowel or a vowel sound, and "thuh" before a consonant. I have never forgotten this. Same thing applies to "a" and "an." Listen to how many people say "thuh" apple, rather than "thee" apple. When "The Artist" was nominated for many academy awards, it was always introduced as "Thuh Artist." Drove me absolutely crazy. Thee Artist flows more easily off the tongue than "Thuh Artist." (Shudder...)

Reply · Like · September 6 at 9:21pm

View 18 more

Facebook social plugin

View Seen & Heard highlights from around the site »

Merriam-Webster on Facebook    Like    160k

**The Merriam-Webster Unabridged Dictionary**

Online access to a legendary resource
Log In or Sign Up »

**Learning English? We can help.**

Visit our free site designed especially for learners and teachers of English
LearnersDictionary.com »



**Our Dictionary, On Your Devices**
Merriam-Webster, With Voice Search
Get the Free Apps! »

**Merriam-Webster's Visual Dictionaries**

The new edition of the remarkable reference features 8,000 illustrations.
Learn More »


Your kids can learn programming... With Bo!
Reserve Yours Today!

**Join Us**

Merriam-Webster on Twitter »


Merriam-Webster on Facebook »

**Bookstore: Digital and Print**
Merriam-Webster references for Mobile, Kindle, print, and more. See all »

**Other Merriam-Webster Dictionaries**
Webster's Unabridged Dictionary »
WordCentral for Kids »
Spanish Central »

Learner's ESL Dictionary »
Visual Dictionary »

Home  Help  About Us  Shop  Advertising Info  Dictionary API
Privacy Policy  About Our Ads  Contact Us  Browser Tools
© 2013 Merriam-Webster, Incorporated

Browse the Dictionary
Browse the Thesaurus
Browse the Spanish-English Dictionary
Browse the Medical Dictionary
Browse the Concise Encyclopedia

# United States Court of Appeals
## for the Federal Circuit

## CERTIFICATE OF SERVICE

*Belimo Automatic A.G. v. United States*

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by Counsel for Plaintiff-Appellant to print this document. I am an employee of Counsel Press.

On March 4, 2014, Counsel for Plaintiff-Appellant has authorized me to electronically file the foregoing **Brief for Plaintiff-Appellant** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

/s/ Robyn Cocho
Robyn Cocho

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32 because this brief contains 12,172 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32 and the type style requirements because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 in 14 point Times New Roman font.

DATED:     March 4, 2014         */s/ Robert F. Seely*
                                 GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP
                                 399 Park Avenue, 25th Floor
                                 New York, N.Y. 10022
                                 Tel. (212) 557-4000
                                 Fax: (212) 557-4415